CLEVELAND ELECTRIC ILLUMINATING CO. ET AL., APPELLANTS.
v. WILLIAMS, DIRECTOR, APPELLEE

[Cite as Cleveland Electric Illum. Co. v. Williams (1977),
55 Ohio App. 2d 272.]

(No. 76AP-929—Decided December 8, 1977.)

*Messrs. Guren, Merritt, Sogg & Cohen, Mr. Michael L. Hardy, Mr. James M. Friedman,* and *Mr. Donald H. Hauser,* for Cleveland Electric Illuminating Co.

*Messrs. Segreti & Tousey* and *Mr. A. Mark Segreti, Jr.,* for Northern Ohio Lung Assn.

*Mr. William J. Brown,* attorney general, and *Mr. David E. Northrop,* for Ned E. Williams, director.

McCORMAC, J. This case involves the control of air pollution from boilers owned and operated by the Cleveland Electric Illuminating Company (hereinafter called CEI)

and the city of Cleveland at the Lakeshore Electric Generating Station, located in the metropolitan Cleveland area. In late 1972, CEI applied for variances permitting them to continue to operate their boilers in violation of applicable emission limitations. The director of the Environmental Protection Agency (hereinafter called director) issued proposed variances to CEI in May 1973, allowing continued operation in violation of emission limitations to July 1, 1975. In June 1973, the CEI requested adjudication hearings on the terms of the variance. In addition, certain citizens, including the Northern Ohio Lung Association (hereinafter called NOLA), filed objections to the applications. The director consolidated hearings for thirteen Ohio utilities and the objectors into one hearing which commenced on March 4, 1974, nine months after the proposed variances were issued. The hearings were conducted by attorney examiners, who permitted the utilities by stipulation with the director and over the objection of NOLA to present testimony going into the issue of whether Ohio's ambient air quality standards and emission limitations were properly adopted.

The hearings were concluded on July 25, 1974, after which the hearing examiners submitted their recommendations to the director. Objections were filed by the parties and the director issued his determination on December 12, 1974, setting forth orders with schedules for the achievements of compliance with emission limitations for particulate pollutants. There was no order issued for compliance with the emission limitations for sulfur dioxide pollutants. Variances were neither issued nor denied.

CEI and NOLA appealed to the Environmental Board of Review in January 1975. By order of October 22, 1976, the Board held that the director had to issue or deny variances, and that the director could not ignore emission limitation requirements for sulfur dioxide. The Board further ordered the director to issue, within one month, variances to CEI allowing violations of emission limitations for particulate pollutants and for sulfur dioxide pollutants. However, the Board directed that the variance be effective for 36 more months after its issuance to allow compliance with

sulfur dioxide emission standards and specified that the director's order be modified to give CEI a variance from the particulate limitations. Both CEI and NOLA have appealed to this court from the Board's order.

NOLA asserts that the Board erred in granting a variance to operate a source of air pollution in violation of applicable air pollution emission standards and regulations for a period longer than one year and for any time after April 15, 1977.

CEI asserts that the Board erred in holding that unconditional variances cannot be granted. CEI also asserts that the Board erred in holding that Ohio's particulate and sulfur dioxide standards were beyond attack in adjudication hearings, contending that the Board erred in examining the director's regulations to determine whether they are reasonable. CEI further contends that the Board applied incorrect standards in reviewing the director's actions.

The director asserts that an adjudication hearing is not a proper forum to challenge the validity of the director's regulations and that the Board exceeded its power in granting a variance for more than one year or for a time extending beyond April 15, 1977.

The first issue is to what extent the director may issue or deny variances from his regulations. In this instance, the director had promulgated ambient air regulations pertaining to particulate sulfur dioxide emissions. CEI sought a variance from these regulations.

R. C. 3704.03, pertaining to the powers of the Director of Environmental Protection, provides in this respect as follows:

"The director of environmental protection may: * * *

"(H) Issue, revoke, modify, or deny variances from his regulations, including variances for emissions in excess of the applicable emission standards. In issuing, revoking, modifying, or denying such variances the director shall hear and give consideration to evidence that:

"(1) Compliance with such standards and other regulations is impractical because of conditions beyond the control of the applicant.

"(2) Compliance with such standards and other regulations would be technically infeasible or economically unreasonable.

"(3) The emissions of the applicant for which a variance is requested have little effect on ambient air quality and do not endanger or threaten to endanger human health, due to topography, direction and velocity of prevailing winds, height of emission source, or other factors.

"(4) Compliance with the standards or other regulations from which variance is sought would produce serious hardship without equal or greater benefit to the public.

"(5) The emissions of the applicant from which a variance is requested were in conformity with the emission standards in force at the time a permit was issued to the applicant under division (F) of this section.

"In issuing such variances, the director may also order the person to whom the permit is issued to furnish plans and specifications and such other information and data as the director may require, and to proceed to take such action within such time as the director may determine to be appropriate and reasonable to prevent, control, or abate his existing emissions of air contaminants. The director shall specify in such variances that the variance is conditioned upon the right of his authorized representatives to enter upon the premises of the person to whom the variance has been issued, at any reasonable time and subject to safety requirements of the person in control of the premises for the purpose of determining compliance with this chapter, the rules adopted thereunder, and the conditions of any permit, variance, or order issued thereunder.

"The director may hold a public hearing on an application for a variance or renewal thereof, at a location in the county where the variance is sought. The director shall give no less than twenty days' notice of the hearing to the applicant by certified mail and cause at least one publication of notice in a newspaper with general circulation in the county where the variance is sought.

The director shall keep available for public inspection at the principal office of the environmental protection agency a current schedule of pending applications for variances and a current schedule of pending variance hearings. The director shall make a complete stenographic record of testimony and other evidence submitted at the hearing. Within ten days after the hearing the director shall make a written determination to issue, renew, or deny the variance, and shall enter his determination and the basis therefor into the record of the hearing. The director shall issue, renew, or deny an application for variance or renewal thereof within six months of the date upon which the director receives a complete application with all pertinent information and data required by the director.

"No variance shall be issued, revoked, modified, or denied until the director has considered the relative interests of the applicant, other persons and property affected by the discharge, and the general public. Any variance granted pursuant to this section shall be for a period specified by the director and may be renewed from time to time on such terms and for such periods, not to exceed one year each, as the director determines to be appropriate. No application shall be denied or variance revoked or modified without a written order stating the findings upon which denial, revocation, or modification is based. A copy of the order shall be sent to the applicant or variance holder by certified mail."

To implement R. C. 3704.03(H), the director promulgated regulation EP-32-03, effective July 28, 1975.[2]

---

[2]"EP-32-03 Variances.

"(A) General Rule. No person shall cause, permit, or allow the operation or other use of any air contaminant source that emits any air pollutant in violation of any applicable law, unless a variance including an approved compliance schedule has been applied for and obtained from the Director for such source, pursuant to the provisions of this rule.

"(B) Applications for Variances

"(1) Applications for variances shall be signed by the corporate President, Vice President reporting directly to the President, or highest ranking corporate officer with offices located in the state; or by an equivalently responsible officer in the case of organizations other than

The first issue is whether the regulations of the director are inconsistent with R. C. 3704.03(H). CEI argues

corporations; or, in other cases, by the source owner or operator; or, in the case of political subdivision, the highest elected official of such subdivision. Such signature shall constitute affirmation that the statements made in the application are true and complete, and shall subject the responsible official to liability under state laws forbidding false or misleading statements. By his signature, the responsible officer shall assume responsibility for operating and maintaining the source and control equipment in a manner designed to assure compliance with applicable law and the terms and conditions of any variance issued to such source.

"(2) Applications for variances shall be submitted to the Ohio EPA within six months of the effective date of these regulations for existing air contaminant sources not in compliance with applicable law on that date. Failure to file a timely application shall be cause for the Director to issue an order immediately prohibiting all emissions from the source.

"(3) Applications for variances shall be made in a form and manner prescribed by the Ohio EPA.

"(4) A separate application for a variance shall be made for each air contaminant source to which this rule, EP-32-03, applies.

"(5) Any variance application that fails to contain a compliance schedule or that, on its face, fails to provide the Ohio EPA with requested information needed to provide a factual basis for ascertaining compliance with each of the requirements of EP-32-03(C)(1) may be considered defective and be treated as if it had not been filed. No hearing need be granted with respect to such improper applications, which shall be returned to the applicant without further processing with an indication of the deficiency.

"(C) Standards for Granting Variances.

"(1) No variance to operate an air contaminant source shall be granted unless:

"(a) Such source is not a new source; and

"(b) There is an approvable compliance schedule for such source. A compliance schedule shall be approvable where it shows to the satisfaction of the Director that:

"(i) The plan and schedule provide for the earliest possible compliance by the source; and

"(ii) Any available alternative operating procedures and interim control measures have reduced or will reduce the impact of such source on the public health; and,

"(iii) Good faith efforts have been and will be made to reduce emissions, or otherwise comply with any state or local laws, ordinances or regulations; and,

"(iv) The proposed control strategy will bring the source into com-

that they are inconsistent since the regulations absolute-

pliance with applicable laws, rules and regulations; and,

"(v) The continued operation of the source does not endanger or threaten to endanger human health; and,

"(vi) The compliance schedule contains a date on or before which the source shall be operated in compliance with applicable law, rules and regulations.

"(2) Except as provided in Section 3704.12 of the Ohio Revised Code, no variance shall be granted from the provision of Rule AP-3-08 governing open burning.

"(D) Action on Applications for Variances.

"(1) Prior to taking any action on an application on a variance, the Ohio EPA may hold a public meeting on the proposed compliance schedule in the manner specified in the Rules of Procedure of the Ohio EPA, Chapter EP-40.

"(2) In granting, revoking, denying, or modifying any variance, the Director shall state his reasons therefor in writing. The decision and reasons therefor shall be made publicly available at the cost of reproduction and handling.

"(3) The Director shall act on an application for a variance within six months of filing a complete application.

"(4) Variances under this rule shall be issued or denied and may be challenged in accordance with the provisions of the Rules of Procedure of the Ohio EPA, Chapter EP-40.

"(E) Interim Reporting. In addition to the other registration and reporting requirements of all air contaminant sources, the holder of a variance shall file reports every two months or as required by the Ohio EPA which shall be signed by the applicant for the variance. These reports shall demonstrate, to the satisfaction of the Director that the source for which the variance was issued is making consistent progress and has met all interim deadlines specified in the compliance schedule or specified by the Ohio EPA. If the responsible official fails to file an interim report, or if such report fails to satisfy the Director that the source is making satisfactory progress, then he shall revoke the variance. The variance holder shall assume full personal responsibility for the completeness and accuracy of statements made in the interim report. False, or misleading statements in an interim report shall be grounds for revocation of the variance, and shall subject the variance holder to the sanctions available under state laws.

"(F) Terms and Conditions

"(1) An approved compliance schedule shall be incorporated into any variance granted and shall be a term and condition thereof.

"(2) Variances shall be effective for whatever period the Director deems appropriate, not to exceed one year. A variance may be renewed only when the Ohio EPA is satisfied that the source for which the variance was granted is making satisfactory progress toward achieve-

ly prohibit variances after April 15, 1977,² thus effectively eliminating the director's discretionary power, under R. C. 3704.03(H), to issue, revoke, modify, or deny variances only after exercising his mandatory duty to consider evidence specified in (H).

At first blush, CEI's argument appears to be valid.

ment of the program specified in its compliance schedule. No variance to operate an air contaminant source in an air quality control region designated as Priority I, II or III, in violation of an omission standard applicable to such region and source, shall be effective after April 15, 1977, except as provided in the following sentence. No variance to operate an air contaminant source in an air quality control region designated as Priority II or Priority III in violation of AP-3-11(B)(4) or AP-3-12(B)(5) or AP-3-14(B)(5) shall be effective after July 1, 1978.

"(3) The possession of a variance to operate in excess of any emission standard, limitation, or regulation of the Ohio EPA shall not relieve the holder of responsibility to comply with all other applicable law and regulations of the Ohio EPA.

"(4) Any variance issued by the Director shall be subject to revision in response to changes in applicable rules and regulations or other factors affecting the compliance of the source or control facility with the standards or conditions of the original variance.

"(5) The transferee of any variance shall, personally, assume the responsibilities of the original variance holder-transferor. The Ohio EPA must be notified in writing of any transfer of a variance.

"(6) Such air pollution emergency episode plans as are submitted and approved shall become terms and conditions of the variance and shall have full force and effect as a part thereof.

"(7) The Director may include such other terms and conditions as are necessary to ensure compliance with applicable law or to gather information about ambient air quality emissions levels, or other aspects of the source operation.

"(G) Variance No Defense to Violations. Possession of a variance relieving an air contaminant source from having immediately to comply with any requirement of applicable law shall not relieve any such source of the responsibility to comply with all other requirements of applicable law.

"(H) Revocation.

"(1) The Director shall revoke a variance if he determines that any of the terms, conditions, standards, or requirements of Sections (C), (E), or (F) of this rule have been or will be violated.

"(2) A variance that has been revoked shall forthwith be surrendered to the Ohio EPA."

²EP-32-03(F)(2).

However, to properly interpret and apply R. C. Chapter 3704, we believe it is necessary to refer to the Federal Clean Air Act, 42 U. S. C. 1857 *et seq.*, as the Ohio General Assembly amended R. C. Chapter 3704, in 1971, to bring it into conformity with the Act. Amended Substitute Senate Bill No. 370, providing for the amendment, stated that the enactment "is necessary in order to comply with the 1970 Amendments to the Federal Clean Air Act." 134 Ohio Laws 650.

In 1970, Congress enacted the Federal Clean Air Act to compel the states to more aggressively address the pervasive problem of poor air quality. For each air pollutant primary and secondary ambient air quality standards were to be established. Title 42, U. S. Code Section 1857 (c) (5), requires states within nine months thereafter to develop and submit to the administrator of the United States Environmental Protection Agency an "implementation plan" which shall result in attainment of primary standards within three years after approval of the plan, and attainment of more stringent secondary standards within a "reasonable time" thereafter. The expense of not submitting an approvable plan is to have the federal administrator promulgate federal regulations enforceable by the United States EPA against sources of air pollution in the state. As stated by the United States Supreme Court in *Train* v. *Natural Resources Defense Council* (1975), 421 U. S. 60, 67, "a State's plan must include * * * measures that may be necessary to insure both timely obtainment and subsequent maintenance of national ambient air standards." Thus, any state plan or portion thereof is to be interpreted consistently with the national requirement of a timely attainment of ambient air standards, and with this end in mind, R. C. 3704.03 was adopted. R. C. 3704.03(D) authorizes the director to adopt regulations "prescribing ambient air quality standards," which include prescribing emission standards for air contaminants. By R. C. 3704.03(E), the director was granted broad authority to adopt a "plan" which insures attainment of federal and state ambient air quality standards.

Even though a state, by regulation, may lawfully authorize variances beyond a date for attainment for feder-

al primary ambient air standards, the Supreme Court has ruled that such a regulation is lawful only insofar as such post-attainment variances do not prevent attainment or maintenance of ambient air quality standards in the area impacted by the pollution source, and only if such variance has been approved by the administrator of the United States EPA as a revision to the state plan. *Train* v. *National Resources Defense Council, supra.*

R. C. 3704.05(A) flatly prohibits emission of air contaminants in violation of applicable regulations unless the operator of the source has obtained a variance from such regulations, pursuant to R. C. 3704.03(H). R. C. 3704.03 (H) authorizes, but does not require, the director to issue variances from his regulations to sources of air pollution which have attained compliance with the applicable emission standard regulations. Considering the entire context of R. C. Chapter 3704 and the manner in which it was enacted, it is reasonable to interpret R. C. 3704.03(H) to prohibit the issuance of a variance that is in conflict with the Federal Clean Air Act, in particular, where the variance defers compliance beyond the time established for national enactment, or which prevents a timely attainment of the air quality standards of the Act.

Ambient air quality standards were originally to be obtained by July 1, 1970, but were later extended to April 15, 1975, and thereafter extended to April 15, 1977. The regulation adopted by the director places the Ohio act in compliance with the national standards giving rise to their adoption as the law in Ohio. Thus, the regulation prohibiting any variances beyond April 15, 1977, is lawful in accordance with the mandates of Ohio law, as set forth in R. C. 3704.03, which was promulgated for the purpose of achieving and maintaining compliance with national ambient air quality standards. The regulation is not in conflict with the enabling statute and is not unreasonable on its face, nor has there been a showing that the regulation pertaining to variances has not been properly formulated. Thus, the regulation must be applied until properly amended or repealed. See *Kroger Grocery & Baking Co.* v. *Glander* (1948), 149 Ohio St. 120.

The action of the Board in ordering a variance for

ambient air quality standards to extend for a period longer than one year or for any time after April 15, 1977, is contrary to law and erroneous.

Although the question is now moot, the director acted within the authority of R. C. 3704.03 and his regulations in attaching conditions to an application for a variance and in requiring a compliance schedule therewith. R. C. 3704.03(H) specifically refers to conditions of a variance.

The fact that a variance is denied or is not in force, either for particulate or sulfur dioxide emissions, does not leave CEI or the director without other remedies that are fair and equitable to CEI or to the public. It does not mean that CEI must be immediately shut down, even if in violation of applicable ambient air quality standards. The director is given discretionary enforcement options and need not request that an injunction be brought pursuant to R. C. 3704.06, even though there is a violation of his regulations. Nor is the Attorney General required to proceed with a prosecution, resulting in a penalty pursuant to R. C. 3704.99. The director, however, is given a great deal more effective enforcement weapon by a holding that no further variance is possible, which means that the operator is acting illegally if the emission from his plant exceeds the applicable air quality regulations. More prompt and effective measures can be taken for enforcement under penalty of severe monetary fines or threat of shut down to achieve, at the earliest possible time, an attainment of properly adopted air quality standards.

NOLA's four assignments of error are sustained.

The next issue is whether the Board may amend the director's regulations or establish new regulations in an appeal from an adjudication hearing in relation to an application for a variance from those regulations. The director contends that a challenge to an administrative regulation is beyond the scope of an adjudication hearing. We agree with the director in this respect.

Persons adversely affected by the promulgation of a regulation by the director may appeal to the Board, pursuant to R. C. 3745.04. Since, in that situation, no adjudicatory hearing has been conducted by the director, but, rather, a legislative proceeding, the hearing before the

Board is *de novo* pursuant to R. C. 3745.05. In this case, no appeal was taken to the Board from the director's promulgation of particulate and sulfur dioxide regulations. On the other hand, CEI and other utilities sought a variance from the regulations. The director's hearing was adjudicatory or quasi-judicial, rather than rulemaking or quasi-legislative. An appeal then was taken to the Board from the director's ruling on the application for variances.

In the variance hearing, evidence may be adduced by the parties concerning the unreasonableness of the standards or regulations as applied to the applicants, as set forth in R. C. 3704.03(H). However, the adjudication hearing, upon the application for a variance, cannot be used as a vehicle for the amendment or revision of the regulations or for the purpose of establishing new regulations. Moreover, the Board cannot use the appeal from the variance order of the director to adopt new rules or regulations, or to modify the rules and regulations adopted by the director. The regulations are not so subject to attack in a variance proceeding either before the director or on appeal therefrom to the Board. Regulations may be adopted, modified or amended only in a quasi-legislative or rulemaking proceeding.

CEI sought variances on the basis that they would be unable to attain compliance with the emission regulations within the time prescribed in the regulations, and further contended that the emission regulations were unreasonable, unlawful and, in some cases, unnecessary.

An issue posed by the appeal of CEI is whether the sulfur dioxide or particulate regulations are subject to challenge in the variance proceeding, which is adjudicatory in nature. The director held and the Board concurred that the regulations were not so subject to challenge. The Board further held that the director's order requiring compliance with particulate emission standards by April 15, 1977, is reasonable and lawful. We agree with that holding.

As to sulfur dioxide standards, all parties apparently agree that the regulations adopted by the Board are out of date and should no longer be applicable to Ohio industries and that new sulfur dioxide regulations need to

be adopted. However, as previously stated, administrative regulations cannot be attacked in an adjudicatory hearing. R. C. 119.11, which is relied upon by CEI, has been repealed effective September 30, 1976, following holdings of unconstitutionality by the Supreme Court, in *Fortner* v. *Thomas* (1970), 22 Ohio St. 2d 13.

Thus, the director should promptly promulgate sulfer dioxide regulations that are reasonable, rather than leaving in effect unenforceable standards that will be, as a practical matter, subject to a successful challenge in an adjudicatory proceeding, although not subject to modification or amendment by that method.

CEI's first assignment of error is overruled.

CEI's fourth and fifth assignments of error are also overruled. The issue of a compliance schedule is now moot as no further variance can be granted after April 15, 1977. Moreover, the director is required to follow his regulations, which require a compliance schedule to be submitted with an application for a variance.

CEI's second, third and sixth assignments of error are sustained. The Board did improperly substitute its judgment for that of the director. Furthermore, it failed to confine its hearing to the record as certified by the director, as required by R. C. 3745.05, since an adjudication hearing had been conducted by the director. The Board was a reviewing body in the appeal herein and not a *de novo* fact finder. Its function was to determine whether the director's order was lawful and reasonable.

NOLA's four assignments of error are sustained. A variance to operate a source of air pollution in violation of applicable emission standards can be for a period of time not to exceed one year, and in no instance can extend beyond April 15, 1977. CEI's first, fourth and fifth assignments of error are overruled, and its second, third and sixth assignments of error are sustained.

The order of the Board is reversed, and the case is remanded to the Board for further proceedings consistent with this decision.

*Judgment reversed.*

STRAUSBAUGH, P. J., and HOLMES, J., concur.