The OHIO ENVIRONMENTAL
COUNCIL, Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent,

Columbus and Southern Ohio Electric
Co., Intervenor.

No. 78–3104.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 6, 1978.

Decided Feb. 16, 1979.

A. Mark Segreti, Jr., Segreti & Tousey Co., LPA, Columbus, Ohio, for petitioner.

Ronald Hausmann, Environmental Protection Agency, Washington, D. C., Mary Ann Muirhead, EPA, Region V, Chicago, Ill., for intervenor.

Paul M. Kaplow, Dept. of Justice, Washington, D. C., Pollution Control Section, Land & Natural Resources Division, for respondent.

Before LIVELY and MERRITT, Circuit Judges; and CECIL, Senior Circuit Judge.

LIVELY, Circuit Judge.

The Ohio Environmental Council (OEC or petitioner) petitions for review of a "final rule" of the United States Environmental Protection Agency (U.S. EPA or respon-dent) approving a revision of the Ohio State Implementation Plan (SIP) previously adopted by Ohio and approved by U.S. EPA on May 31, 1972 pursuant to the Clean Air Act, 42 U.S.C. § 7401 *et seq.*[1] (the Act). The revision exempts two boilers at the Picway Generating Station of Columbus and Southern Ohio Electric Co. (C&SOE) from regulations which control emissions of particulate matter. It is a condition of U.S. EPA's approval of the revision that the two boilers not be operated simultaneously and that both be retired permanently on or before October 1, 1980. The final rule was published in 43 Fed.Reg. No. 22, p. 4257, effective February 1, 1978.

As required by the Act, the Ohio SIP established an attainment date for primary and secondary national ambient air quality standards (NAAQS) for suspended particulate matter. Beginning in 1972 C&SOE sought variances granting relief from the attainment date for a number of its electric generating units. These variances were sought in "adjudication proceedings" before the Ohio Environmental Protection Agency (Ohio EPA) as prescribed by statute. The adjudication proceedings were concluded on April 4, 1975 with a "consent and abatement order" entered into by Ohio EPA and C&SOE which, *inter alia*, exempted boilers 7 and 8 at Picway from any emissions limitations in view of their size, use and scheduled retirement. The consent order contained the following language:

> The supporting documentation demonstrates that this SIP revision will not interfere with attainment and maintenance of National Ambient Air Quality Standards for particulate matter.

Acting pursuant to section 110(a)(3) of the Act, 42 U.S.C. § 7410(a)(3), the Governor of Ohio submitted the consent and abatement order to U.S. EPA as a proposed revision of the Ohio SIP on October 17, 1975. The Regional Administrator of U.S. EPA returned the proposed revision to the Ohio authorities, noting that there had been

---

1. Following the Clean Air Act Amendments of 1977, Pub.L. No. 95–95, 91 Stat. 685 *et seq.* (1977), the provisions of the Clean Air Act were transferred from 42 U.S.C. § 1857 *et seq.* to 42 U.S.C. § 7401 *et seq.*

no notice and public hearing prior to adoption of the revision by Ohio EPA and that further information was required with respect to the emissions of particulate matter from boilers 7 and 8.

On November 17, 1976 the Governor of Ohio submitted to U.S. EPA an "air quality dispersion modeling analysis" which purported to demonstrate that the NAAQS would be attained and maintained so long as the two boilers were not operated simultaneously. Thereafter, on March 16, 1977, a public hearing was held on the proposed revision pursuant to properly published notices on February 12 in two newspapers and in the February 14th edition of *OEPA Weekly Review*. On June 1, 1977 the Governor of Ohio made a "supplemental submittal" to U.S. EPA which documented the public hearing. During the interval between publication of the proposed rule by U.S. EPA on September 21, 1977 and publication of the final rule, OEC submitted comments urging disapproval of the proposed revision on the same grounds now argued to this court.

### I

Several procedural arguments are advanced by OEC. It is first contended that the SIP revision was never "adopted" by Ohio EPA since Ohio law does not permit revision in adjudication proceedings. It is the position of OEC that a revision may be accomplished under Ohio law only by formal rulemaking proceedings after reasonable notice and public hearings. In the present case there was no notice or public hearing on the specific proposal that the consent and abatement order be treated as an SIP revision prior to the first submission to U.S. EPA. It is next argued that even if a revision may be effected by means of a consent order in adjudication proceedings, it is contrary to both Ohio and federal law[2] to enter such an order without prior notice and public hearings. OEC argues that since

there was no public notice that the variance adjudication proceedings were to be considered part of a proposed revision, the fact that OEC had an opportunity to participate in those proceedings is irrelevant. It is further contended that the public hearing which was held after the consent and abatement order had been entered did not satisfy the requirement of § 110(a)(3)(A).

In response to these arguments U.S. EPA maintains that the procedural requirements of § 110(a)(3)(A) were met and that Ohio law was followed. Respondent finds no support for petitioner's claim that a revision may only be adopted in formal rulemaking proceedings. It points out that C&SOE consistently sought exemption from emission limitations for boilers 7 and 8 from the beginning of the variance proceedings in 1972. Notices were published and there was ample opportunity for OEC to participate or intervene in those proceedings. Thus the respondent contends that the notice and hearings in connection with the variance proceedings were sufficient. However, even if these hearings were deficient, it is clear, according to U.S. EPA, that reasonable notices were published and a sufficient public hearing was held between the first and supplemental submittals. Counsel for OEC testified and submitted a number of exhibits at this hearing. The Administrator of U.S. EPA specifically found that the procedural requirements of § 110(a)(3)(A) were satisfied. 42 Fed.Reg. at 47565.

It was only after the March 16, 1977 Ohio hearing that U.S. EPA published the proposed revision as a proposed rule. In doing so, it requested public comments. Counsel filed comments for OEC urging disapproval. Since OEC contended in its comments that Ohio law had not been followed, respondent requested an opinion from the office of the Attorney General of Ohio. In response the Ohio Attorney General's office stated that the procedures fol-

---

**2.** Section 110(a)(3)(A), 42 U.S.C. § 7410(a)(3)(A) provides:

The Administrator shall approve any revision of an implementation plan applicable to

an air quality control region if he determines that it meets the requirements of paragraph (2) and has been adopted by the State after reasonable notice and public hearings.

lowed were lawful and that the consent and abatement order was enforceable. The petitioner asserts that the public hearing of March 16, 1977 was "pro forma" only since the decision had already been made by Ohio EPA prior to the hearing and that it was arbitrary and capricious for U.S. EPA to rely on the opinion of the Attorney General's office in view of several decisions of Ohio courts which are claimed to hold that revision of the Ohio SIP may not be accomplished in adjudication proceedings.

Upon consideration of these various procedural arguments the court concludes that they do not require U.S. EPA's approval of the Ohio SIP revision to be set aside. Section 110(a)(3)(A) of the Act requires the Administrator to approve an SIP revision if he determines that the substantive requirements as set forth in § 110(a)(2)(A) through (k), 42 U.S.C. § 7410(a)(2)(A)—(K), have been met and that the revision was adopted after reasonable notice and public hearings. It is a further requirement of the law that a plan be legally enforceable. See 40 C.F.R. § 51.11 (1977).

There was ample opportunity for OEC to participate in the lengthy state proceedings which culminated in the consent and abatement decree. More important is the fact that after U.S. EPA returned the request for approval to the State for hearings, OEC participated actively in those hearings and objected on the same grounds which form the basis of this petition for review. It was not unreasonable for U.S. EPA to grant the State of Ohio an opportunity to hold this hearing or to view its action following the hearing as an adoption of the proposed revision. We know of no rule of administrative law which prevents a second hearing from being held where there have been procedural deficiencies in an earlier hearing. The purpose of a public hearing is to receive comments from interested persons and groups. That purpose was accomplished here.

There is nothing in the record to support the contention that the March 17 hearing was "pro forma" only. Counsel for OEC was not limited in his presentation; his arguments just failed to persuade the decision maker. The assertion by OEC that if there was an adoption of the revision by Ohio EPA it occurred when the consent and abatement order was entered rather than at the conclusion of the public hearing is fallacious. It is obvious that Ohio EPA could not propose a revision without first determining its content. When the consent and abatement order was entered, whatever its effect otherwise with respect to the Ohio SIP, it was nothing more than an agreement between C&SOE and Ohio EPA on the terms of a proposed revision. Its adoption by Ohio EPA as a revision to the SIP occurred after the public hearing which satisfied the requirement of § 110(a)(3)(A).

Even less substantial is the claim that it was arbitrary and capricious for the Administrator of U.S. EPA to accept an opinion of the office of the Attorney General of Ohio on a matter of Ohio law. The opinion set forth the legal reasoning on which it was based, and the Administrator was entitled to rely upon it. Since this case was briefed, one Ohio decision relied on by OEC for its assertion that Ohio law was violated has been set aside on appeal. In *Broadway Christian Church v. Williams*, —— Ohio App. ——, (Court of Appeals, Cuyahoga County, August 10, 1978), the decision of the Ohio Environmental Board of Review (EBR) was reversed. The Court of Appeals held that the director of the Ohio EPA may issue consent and abatement orders notwithstanding the absence of the word "consent" in the statute defining his authority.

The petitioner relies on two other opinions from Ohio for its assertion that the revision was never adopted by Ohio EPA. Upon examination neither opinion is found to speak as clearly as represented by OEC. In *Cleveland Electric Illuminating Co. v. Williams*, 55 Ohio App.2d 272, 380 N.E.2d 1342 (Franklin County 1977), the court was concerned with the procedure for obtaining a variance under Ohio Revised Code (ORC) § 3704.03(H). The case was not concerned with revision of the Ohio SIP and the decision does not establish unequivocally that

the Ohio SIP may only be revised by formal rulemaking as contended by OEC. Similarly, petitioner's contention that the Ohio Environmental Review Board held in *OEC v. Williams*, EBR 76–24 (1976), that no revision to the Ohio SIP had been adopted in the administrative proceedings which led to exemption of boilers 7 and 8 is not supported by the decision itself. The EBR held that no final appealable action had been taken by Ohio EPA and the EBR had no jurisdiction. Further, our examination of ORC § 3704.04, which is part of the Ohio SIP, does not lead to the conclusion that a revision may only be accomplished by formal rulemaking, and it appears that no Ohio court has so held. The Administrator of U.S. EPA did not act arbitrarily, capriciously, or in an otherwise unlawful manner in determining that formal rulemaking was not required for a revision of the Ohio SIP.

▮ We conclude that the respondent acted reasonably in determining that the procedural requirements of Ohio law had been met and that the proposed revision was "adopted by the State after reasonable notice and public hearing." 42 U.S.C. § 7410(a)(3)(A). As this court pointed out in *Northern Ohio Lung Association v. E. P. A.*, 572 F.2d 1143 (6th Cir. 1978), the states are given wide discretion in formulating and revising their individual implementation plans. Under the Act the states are given the primary responsibility for attaining and maintaining air quality, and the role of U.S. EPA is a secondary one. *Train v. Natural Resources Defense Council*, 421 U.S. 60, 79, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). The arguments of OEC, both substantive and procedural, were heard by the state agency charged by state law with enforcing the Ohio SIP. No appeal was taken by OEC to an Ohio court where a

challenge might have been made to the adequacy of the administrative proceedings. In view of this failure to seek a definitive ruling on its claim of procedural irregularities it cannot be heard to complain of U.S. EPA's reliance on an opinion from the office of the State Attorney General. The action of U.S. EPA is clearly consistent with its secondary role, particularly in view of the fact that the Act is completely silent as to the methods which the states may employ in revising implementation plans.

## II

It is mandatory that U.S. EPA approve an SIP or a revision to an SIP if it is adopted after reasonable notice and public hearings and if it meets the eleven substantive requirements set forth in section 110(a)(2)(A) through (K) of the Act, 42 U.S.C. § 7410(a)(2)(A)—(K). The petitioner contends that approval of the instant revision was unlawful because of failure to comply with two of the substantive requirements of the statute, those contained in subsections (A) and (B) of section 110(a)(2).

▮ It is first argued that approval of the revision by the respondent was arbitrary, capricious and unlawful because the revision does not require that the NAAQS be timely attained, a condition for approval contained in § 110(a)(2)(A).[3] As the Supreme Court pointed out in *Train v. N. R. D. C., supra*, the Clean Air Act required U.S. EPA to promulgate two types of national ambient air quality standards. Primary standards are those required to protect public health, and secondary standards relate to the protection of public welfare as it is affected by air pollution. 421 U.S. at 65, 95 S.Ct. 1170. There is no fixed time for attainment of secondary standards.

---

**3.** Section 110(a)(2)(A), 42 U.S.C. § 7410(a)(2)(A), provides:

The Administrator shall approve such plan, or any portion thereof, if he determines that it was adopted after reasonable notice and hearing and that—

(A) except as may be provided in subparagraph (I), (i) in the case of a plan implementing a national primary ambient air quality standard, it provides for the attainment of

such primary standard as expeditiously as practicable but (subject to subsection (e) of this section) in no case later than three years from the date of approval of such plan (or any revision thereof to take account of a revised primary standard); and (ii) in the case of a plan implementing a national secondary ambient air quality standard, it specifies a reasonable time at which such secondary standard will be attained; . . . .

Whereas § 110(a)(2)(A) provides that a state SIP will be approved by U.S. EPA only if it provides for attainment of the primary standard within three years after approval of the plan, to be approved an SIP need only provide for attainment of the secondary standard within a reasonable time. In this case OEC contends only that the attainment of the secondary standard is affected.

■■■ A number of somewhat related arguments are made in support of the position that the revision failed to comply with the requirements of § 110(a)(2)(A). It is contended, first, that it was error to measure the effect of boilers 7 and 8 on the immediate ambient air only—that effect of their emissions on the entire Columbus Air Quality Control Region (AQCR), which OEC characterizes as a "problem area," should have been considered. The Columbus AQCR comprises a large area in central Ohio. The Picway plant is an isolated stationary source in a rural portion of that region. The fact that the NAAQS may be exceeded in other parts of the AQCR is irrelevant. There is no requirement that an entire AQCR must be in compliance before a specific source within the area may be granted a variance or exemption. The proper inquiry is directed to the emissions of a particular source of pollution and its effect on the NAAQS. In *Cleveland Electric Illuminating Co. v. E. P. A.*, 572 F.2d 1150 (6th Cir. 1978), this court based its approval of the RAM model for measuring pollution levels, in part at least, on the fact that it determines the effect on the ambient air of emissions from specific sources. The existence of violations by other installations in the Columbus AQCR provides no basis for denying approval of the exemption of Picway boilers 7 and 8 unless it is shown that the exemption will cause the existing violations in the region to continue or become more serious. There was no such showing in this case. On this record it was

permissible to consider only the effect on the immediate ambient air of exempting boilers 7 and 8.

■ The petitioner also makes a number of criticisms of the methods employed by U.S. EPA in determining that attainment and maintenance of the secondary NAAQS would not be affected by the revision. These arguments are without merit. The use of the MAXT–24 dispersion model[4] to determine predicted concentrations in the ambient air due to emissions from particular sources was specifically approved by this court in *Cincinnati Gas & Electric Co. v. E. P. A.*, 578 F.2d 660 (6th Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 1017, 59 L.Ed.2d 72 (1979). Further the dispersion model assumptions concerning compliance by the baseload unit (the main generator which would be in continuous operation) at the Picway installation were appropriate and had been verified by the Ohio EPA. The contention that U.S. EPA acted arbitrarily in not considering "the background levels of particulate pollutants" is not supported by the record. The background levels were measured when the baseload unit was not in compliance, and it was found that the primary standards were met then. Subsequently the baseload unit was equipped with an electrostatic precipitator which drastically reduced its emissions. It was reasonable for U.S. EPA to conclude that even the secondary standards would not be exceeded when the baseload unit was in compliance. We likewise find no merit in the contention that U.S. EPA erred in assuming that boiler 7 emitted more particulates than boiler 8.

Finally in relation to § 110(a)(2)(A), OEC contends that the diffusion modeling analysis showed a violation of the secondary NAAQS by Picway boilers 7 and 8. The respondent disputes this claim. The petitioner asserts that the data from the actual monitoring of Picway disclosed that during

4. Dispersion modeling studies consist of two steps. First, an approved device is used to monitor the actual effect of the emissions from a given source on the ambient air. Next, a computer calculation is obtained which is a predictor of the effect of emissions from the source in light of known facts and verified assumptions concerning plant design, emission rates, surrounding terrain, atmospheric conditions and other factors which influence the total effect on air quality of the emissions from a given stationary source.

the year of monitoring, the 24-hour limit of the secondary NAAQS was exceeded on three days. Since the proposed revision permits these excessive emissions to continue beyond three years from the date of approval of the SIP, it is argued that the revision violates § 110(a)(2)(A). In its summary published with the final approval of the revision the U.S. EPA made a categorical finding that the revision would not interfere with attainment or maintenance of the NAAQS for particulate matter. Even assuming that OEC's interpretation of the technical data is correct, we fail to see how the fact that violations of the secondary NAAQS occurred on three days in 1974 and 1975 would disqualify the revision. No violation of the primary NAAQS is claimed to have occurred. Section 110(a)(2) sets no fixed time for achievement of the secondary NAAQS. The exemption of boilers 7 and 8 runs only until October 1, 1980. The determination that the revision will not interfere with attainment and maintenance of NAAQS carries with it the necessary implication of a finding that October 1, 1980 is a reasonable time for attainment of the secondary NAAQS.

■■■■■ OEC appears to argue that since Ohio adopted a single SIP for both primary and secondary standards the stricter secondary standard became subject to the three-year attainment date prescribed in the Act for the primary standard, and that this attainment date could not be changed by a revision. It is true that a state may adopt an ambient air standard that is more stringent than the national primary standard. *Union Electric Co. v. E. P. A.*, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976). However, we can find no basis in the statute or any regulations for holding that the § 110(a)(2)(A) requirement for attainment of the secondary standard within a reasonable time was converted into an immutable three-year limitation by Ohio's adoption of a single SIP. Such a holding would nullify the provisions of the Act which give each state broad authority to revise its SIP. In *Northern Ohio Lung Association v. E. P. A., supra,* 572 F.2d at 1149, this court stated:

The Act recognizes that, as long as an SIP continues to satisfy the requirements of Section 110(a)(2) of the Act, 42 U.S.C. § 7410(a)(2), a state may revise *any* aspect of its plan, including the date of attainment. *Train v. NRDC, supra,* 421 U.S. at 80, 95 S.Ct. 1470 (emphasis in original).

■■■■ Congress placed responsibility for enforcing the Clean Air Act in the U.S. EPA. Its determinations on basic questions of administration of the Act are entitled to our deference, unless based on clearly erroneous premises or wrongful interpretation or application of its provisions. In *Train v. NRDC, supra,* 421 U.S. at 93–94, 95 S.Ct. at 1488–89, the Supreme Court stated:

The judgments which the Agency must make when passing on variances under § 110(a)(3) are whether the ambient air complies with national standards, and if so whether a proposed variance would cause a plan to fail to insure maintenance of those standards. These judgments are little different from those which the Agency had to make when it approved the initial plans into which respondents seek to have the States frozen. In each instance the Agency must measure the existing level of pollution, compare it with the national standards, and determine the effect on this comparison of specified emission modifications.[28] That Congress is of the opinion that the Agency can feasibly and reliably perform these functions is manifest not only in its 1970 legislation, but also in a 1974 amendment designed to conserve energy.

[28] We recognize that numerous applications for changes of a specific nature have a potential for creating a different kind of problem from that posed by the formulation of general regulations. Such a problem would arise when the grant of a variance to one source would not affect national standards, but the simultaneous or subsequent grant of similar variances to similar sources could result in the plan's failure to insure the attainment and maintenance of the standards. As we have noted in the text, however, the Agency charged with the administration of the Act, and made ultimately responsible for the attainment and maintenance of the national standards, does not view this problem as any-

where near insurmountable. Variances under § 110(a)(3) cannot be granted until first the State, and then the Agency, have determined that they will not jeopardize the standards. We cannot and do not attempt to foresee, at this stage in the administration of the statute, all of the questions, to say nothing of the answers, that may arise in the allocation of a limited number of available variances. The fact that the interpretation placed on the section by the Agency may on occasion require administrative flexibility and ingenuity to a greater degree than would a more rigid alternative is not, of course, a reason for rejecting the Agency's otherwise reasonable construction.

█ We conclude that it was within the discretion of the Administrator of U.S. EPA to determine that October 1, 1980 is a reasonable time for attainment of the secondary NAAQS, and his approval of the revision was not, on that ground, arbitrary, capricious or unlawful.

The petitioner also contends that U.S. EPA failed to comply with a requirement of § 110(a)(2)(B)[5] in approving the revision. Since the instant revision permits C&SOE to operate boilers 7 and 8 after April 15, 1977 without the installation of control equipment, OEC asserts that the "emissions limitations" provision of § 110(a)(2)(B) was violated. This argument is based on the following statement by this court in *Big Rivers Electric Corp. v. E. P. A.*, 523 F.2d 16, 22 (6th Cir. 1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976):

No plan satisfies the requirement of Section 110(a)(2)(B) which might be construed to permit a source of pollutant emissions to continue operating beyond the time limit established in Section 110(a)(2)(A) without the application of one or more systems which control the "kind and amounts" of its air contaminant emissions.

The quoted language has no application because the instant revision does not permit the operation of boilers 7 and 8 "beyond the time limit established in Section 110(a)(2)(A) . . . ." *Big Rivers, supra.* That section established time limits for the primary NAAQS, and only the secondary NAAQS would be affected by the continued operation of these boilers. There is no fixed time limit for the secondary standard, and October 1, 1980 has been found to be a reasonable date for its attainment.

The petitioner makes one further argument which requires discussion. This relates to section 113(d)(3) of the Act, 42 U.S.C. § 7413(d)(3),[6] which provides for the issuance of delayed compliance orders for individual sources of air pollution in those cases where the sources intend to comply by means of a termination of operation. This section, which was added to the Act as part of the 1977 amendments long after the present revision proceedings were commenced, allows a source which is not in compliance with an SIP to receive an extended compliance date without a revision of the underlying SIP. In the present case, argues OEC, all of the factors necessary to invoke section 113(d)(3) are present: (1) the two boilers are not in compliance with the Ohio SIP; (2) C&SOE intends to comply by means of a termination of operation; and (3) C&SOE wants an extension of time for

---

5. Section 110(a)(2)(B), 42 U.S.C. § 7410(a)(2)(B), provides:

. . . The Administrator shall approve such plan, or any portion thereof, if he determines that it was adopted after reasonable notice and hearing and that—

\* \* \* \* \* \*

(B) it includes emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of such primary or secondary standard, including, but not limited to, transportation controls, air quality maintenance plans, and preconstruction review of direct sources of air pollution as provided in subparagraph (D); . . . .

6. In pertinent part § 113(d)(3), 42 U.S.C. § 7413(d)(3), provides:

(3) If any source not in compliance with any requirement of an applicable implementation plan gives written notification to the State (or the Administrator) that such source intends to comply by means of replacement of the facility, a complete change in production process, or a termination of operation, the State (or the Administrator) may issue an order under paragraph (1) of this subsection permitting the source to operate until July 1, 1979, without any interim schedule of compliance: . . . .

 

compliance. Section 113(d)(3), then, is the exclusive provision governing the instant situation, according to OEC.

OEC's analysis misses the mark in at least one important respect. Where section 113(d) provides a mechanism for handling violations of SIP requirements, section 110(a) provides a mechanism for *changing* SIP requirements that can be shown to be more stringent than necessary to meet the NAAQS. As stated in the Legislative History for section 113(d):

> If a State variance or other delaying action will not prevent or interfere with the timely attainment and maintenance of the national ambient standards or with the policy of prevention of significant deterioration required by . . . the act, and the Administrator so determines, then such a variance may be treated as a plan revision and approved by the Administrator under section 110(a)(3) of the Act. On the other hand, if a State variance or other delaying would have any such effect, then it may only be issued in accordance with the procedures, criteria, and time constraints specified in section [113]. House Report No. 294, Pub.L. 95–95, Reprinted at 1977 U.S.Code Cong. and Admin.News pp. 1077, 1135.

 We conclude that § 113(d) does not provide the exclusive means of extending the compliance date of sources which are to be retired. In this case it has been found specifically that the instant "variance or delaying action" will not prevent or interfere with the timely attainment and maintenance of the NAAQS. Thus, the change of revision procedure under § 110(a)(3) which was followed in the present case was the proper one.

We have not attempted to answer every argument put forward by the petitioner. Many of OEC's contentions amount to little more than questioning decisions made by U.S. EPA involving methodology and technical determinations. These objections were made in the comments filed with U.S. EPA and rejected. This is an area in which the respondent is required to apply its expert knowledge, and we are not

free to substitute our judgment for that of the agency charged with responsibility for enforcement of the Act. *Mision Industrial, Inc. v. E. P. A.*, 547 F.2d 123, 129 (1st Cir. 1976). The only requirement for U.S. EPA's approval of a revision of an SIP is that it "not cause the plan to fail to comply with the requirement of § 110(a)(2)" of the Act. *Train v. N.R.D.C., supra*, 421 U.S. at 70, 95 S.Ct. at 1477; *Northern Ohio Lung Association v. E.P.A., supra*, 572 F.2d at 1149. The finding by respondent that the instant revision satisfied these requirements is neither arbitrary nor capricious, or otherwise unlawful.

The petition for review is denied.