UNITED STATES STEEL CORPORA-
TION, Petitioner in No. 79–2254

Bethlehem Steel Corporation,
Petitioner in No. 79–2276

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent,

The Commonwealth of Pennsylvania
Department of Environmental
Resources, Intervenor.

Nos. 79–2254, 79–2276.

United States Court of Appeals,
Third Circuit.

Argued Sept. 16, 1980.

Decided Oct. 27, 1980.

Blair S. McMillin (argued), Harley N. Trice, II, Reed Smith Shaw & McClay, Pittsburgh, Pa., for petitioner, Bethlehem Steel Corp.

Angus MacBeth, Acting Asst. Atty. Gen., Donald W. Stever, Jr., Chief, Pollution Control Section, Raymond W. Mushal, Atty., Dept. of Justice, Mitchell H. Bernstein (argued), Atty., Washington, D. C., Renee Sarajian, Asst. Regional Counsel, EPA, Philadelphia, Pa., for respondent; Michele Beigel Corash, General Counsel, EPA, Washington, D. C., of counsel.

Thomas Y. Au (argued), Louis A. Naugle, Asst. Attys. Gen., Dept. of Environmental Resources, Harrisburg, Pa., for intervenor.

Before ADAMS, HUNTER and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

PER CURIAM:

In these consolidated cases we are asked, pursuant to § 307(b) of the Clean Air Act, 42 U.S.C. § 7607(b), to review an action by the Environmental Protection Agency (EPA) approving amendments to Pennsylvania's air pollution control State Implementation Plan (SIP) dealing with emission standards for coke oven batteries. Petitioners contend that EPA applied an incorrect substantive standard in evaluating the SIP revision, that it improperly qualified its approval, and that it based its action on impermissible considerations of technological feasibility. Because we conclude that EPA acted in accordance with the Clean Air Act, we dismiss the petitions for review.

### I. Facts

In 1977, the Pennsylvania Department of Environmental Resources (DER) adopted, regulations governing the level of emissions from coke oven batteries, in order to control more effectively this potentially carcinogenic air contaminant.[1] As required by the Clean Air Act, DER submitted these new regulations to EPA, requesting that they be approved as a revision to its SIP under § 110(a)(3) of the Act, 42 U.S.C. § 7410(a)(3). DER included in its submission an air quality impact statement, which demonstrated that "the new regulations are more stringent than the former requirements" for coke oven emissions.

Following the procedures mandated by the Administrative Procedure Act (APA) and the Clean Air Act, the EPA published a notice of proposed rulemaking, inviting public comment on the Pennsylvania SIP revision, 43 Fed.Reg. 56910 (Dec. 5, 1978). EPA specifically urged comments on the following two questions involving the interaction of federal requirements with certain features of the Pennsylvania regulations:

1. Would a deferred compliance order extending a particular source's deadline for meeting the emissions limitations con-

---

1. For a description of coke oven batteries, their role in the steelmaking process, and their pol-

luting effects, see *American Iron & Steel Inst. v. OSHA*, 577 F.2d 825 (3d Cir. 1978).

stitute a "variance" from the SIP? If so, would it have to be submitted for EPA approval as a SIP revision under § 110(a)(3), before the deferral schedule could take effect as a matter of federal law?

2. If DER determines that emissions from a particular control device in excess of the limitations are of "minor significance," and thus permissible, must this "minor significance determination" be submitted to EPA as a SIP revision before taking effect as a matter of federal law?

Bethlehem Steel Corporation, U. S. Steel Corporation, and the Commonwealth of Pennsylvania each submitted comments, addressing these two issues as well as other concerns. Essentially, the comments suggested that deferral orders and minor significance determinations were not "variances" from applicable SIP standards, but were actually findings of effective compliance. U. S. Steel also offered extensive technical comments to demonstrate that the regulations were neither necessary nor feasible.

EPA adopted a Final Rule approving the DER regulations as a SIP revision on July 17, 1979, 44 Fed.Reg. 41429. The published notice contained brief responses to the comments, and it was accompanied by a rationale document responding in full to the public comments and explaining EPA's decision in greater detail. In the Federal Register notice, EPA stated that the "amendments . . . are approved subject to the following conditions, interpretations, and comments": (1) that minor significance determinations and deferred compliance orders "shall not take effect as a matter of federal law unless submitted to and approved by EPA as a SIP revision;" and (2) although EPA was precluded from and did not consider necessity and achievability in reaching its decision, it felt obliged to respond to U. S. Steel's comments by noting that the regulations were both necessary and feasible. Finally, EPA supported its approval by noting that the regulations would "not interfere with the attainment and maintenance of the national ambient air quality standards," as demonstrated by Pennsylvania's showing

that they were equally as stringent as the former limitations.

It is these EPA statements that provoked this petition, and they are the predicate of the substantive challenges raised by the petitioners.

## II. Substantive Standard Applied by EPA

We note at the outset that the applicable standard for reviewing this final agency action is that of § 10(e) of the APA, 5 U.S.C. § 706. A court of appeals should set aside EPA's action only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory . . . authority, or limitations. . . ."

Under section 110(a)(2)(A) of the Clean Air Act, a fundamental requirement for approval of any SIP is that it provide for the attainment of primary national ambient air quality standards [NAAQS] "as expeditiously as practicable." 42 U.S.C. § 7410(a)(2)(A). Revisions of SIPs are subject to the same substantive requirement, because § 110(a)(3)(A) authorizes the approval of any revision that meets the requirements of subsection (2).

Bethlehem Steel contends that § 110(a)(2)(A) compels the EPA to make a specific finding that a revision will provide for attainment of the NAAQS "as expeditiously as practicable." Thus, according to its argument, it was unlawful for EPA to approve Pennsylvania's revision on the mere finding that it would not "interfere with attainment and maintenance" of NAAQS.

Essentially, this argument seeks to distinguish a standard requiring an inquiry into whether a revision will interfere with timely attainment of NAAQS from a standard mandating an affirmative finding that a particular revision will achieve expeditious attainment. Such a distinction is largely semantic, rather than substantive. If the SIP that is being revised met the attainment requirement of § 110(a)(2)(A), then any revision altering emission limitations that does not *interfere* with that attain-

ment would, by definition, satisfy § 110(a)(2)(A).

This analysis is supported by *Train v. NRDC*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975), in which the Supreme Court implicitly approved EPA's "noninterference" standard for assessing SIP revisions. The issue in *Train* was whether individual variances permitting delayed compliance with emission limitations could be approved as revisions under § 110(a)(3), or whether they had to be evaluated under the more rigorous standards governing plan postponements set out in § 110(f). In defending its use of the revision procedure, EPA argued that § 110(a)(3) authorized approval of variances that "did not interfere with attainment or maintenance" of the NAAQS. 421 U.S. at 74–75, 95 S.Ct. at 1479. Finding EPA's interpretation "sufficiently reasonable" to be accepted by a reviewing court, the Supreme Court approved EPA's overall construction of the Act. *Id.* at 87, 95 S.Ct. at 1485. The Court elaborated on EPA's duty in evaluating § 110(a)(3) revisions:

> The judgments which the Agency must make when passing on variances under § 10(a)(3) are whether the ambient air complies with national standards, and if so whether a proposed variance would cause a plan to fail to insure maintenance of those standards.... In each instance the Agency must measure the existing level of pollution, compare it with the national standards, and determine the effect on this comparison of specified emission modifications.

*Id.* at 93, 95 S.Ct. at 1488. The Court also described this standard as a determination that a revision must not cause a SIP to fail to comply with NAAQS. *Id.* at 70, 95 S.Ct. at 1477.

■ In order to make a judgment as to whether a revision harms compliance efforts, or "would cause a plan to fail to insure maintenance" of NAAQS, the logical inquiry for the EPA is to assess whether the proposed change *interferes* with attainment. *See e. g., Ohio Environmental Council v. U. S. EPA*, 593 F.2d 24 (6th Cir. 1979), upholding EPA approval of a revision to Ohio's SIP based on the "noninterference" standard.[2]

■ Bethlehem argues that even if *Train* implicitly approved a noninterference test, this standard is inappropriate here because in 1976 EPA ordered Pennsylvania to revise its SIP, determining that it was inadequate to achieve the primary NAAQS. Thus, Bethlehem reasons, the current finding that the revision does not interfere with a plan previously held to be inadequate cannot satisfy the expeditious attainment requirement in § 110(a)(2)(A). This argument is not persuasive, because EPA specifically determine that the coke oven emission regulations previously in effect were adequate, and it advised Pennsylvania that it would not have to revise that particular aspect of its SIP. 41 Fed.Reg. 28829 (July 13, 1976). It therefore follows that EPA was justified in approving the new coke oven regulations once it ascertained that they were of equal or greater stringency to the already "sufficiently restrictive" emission limitations.

■ The next challenge by Bethlehem to the substantive standard applied by EPA focuses on § 172 of the 1977 amendments to the Clean Air Act, 42 U.S.C. § 7502, which requires states in nonattainment areas to submit new SIPs that specifically restrict construction of facilities that would contrib-

**2.** Petitioners rely on *Manchester Environmental Coalition v. EPA*, 612 F.2d 56 (2d Cir. 1979), to support their contention that the EPA did not apply the proper substantive standard. That case, however, did not involve the issue whether the correct substantive standard had been applied. The question instead was whether Connecticut had to show only that its revocation of an indirect source review program complied with the *procedural* requirements of § 110, or whether it also had to establish that

the revocation met the *substantive* requirements of § 110(a)(2)(A). The court stated the applicable substantive standard as a showing that the SIP would still be capable of achieving and maintaining the NAAQS. *Id.* at 58. Clearly, if a revision does not *interfere* with attainment, the plan will still be capable of achieving and maintaining the NAAQS. Thus, the analysis in *Manchester* reveals that petitioners' objections to the standard applied by EPA are, in effect, semantic.

ute to violations of the NAAQS. This section states that "the provisions of an applicable implementation plan ... in any non-attainment area ... shall provide for attainment of each NAAQS in each such area as expeditiously as practicable." Bethlehem contends that this language imposes an obligation on EPA to make a de novo determination that any SIP revision submitted after 1977 will provide for expeditious attainment of NAAQS. It is urged that EPA failed to satisfy this duty when it applied the noninterference standard to Pennsylvania's submission.

The state and EPA respond to this argument by insisting that § 172 was designed to govern only comprehensive plan revisions under Part D of the 1977 amendments. When DER submitted the coke oven regulations to EPA it specifically stated that they were "not envisioned as the total revision package for any nonattainment area. Area specific plans will be submitted at a later date ... as required by the 1977 Clean Air Act Amendments." Pennsylvania submitted its comprehensive Part D plan in July, 1979, 44 Fed.Reg. 43306, and EPA approved it, following the requirements of § 172, on May 20, 1980, 45 Fed.Reg. 33607.[3]

Section 172 was designed to enable states that had failed to achieve the NAAQS by the deadline imposed in the original Act to submit a new comprehensive plan, in order to avoid the drastic consequence of closing existing facilities.[4] Thus, when Part D and § 172 speak of "revised" plans, they contemplate a new and complete plan replacing the original SIP, rather than the minor revisions altering or updating particular emission standards which are covered by § 110(a)(3). The conclusion that only a comprehensive, redrawn SIP must meet § 172 requirements is underscored by § 129 of the 1977 amendments, which imposes the obligation to submit a § 172 plan.

Section 129(c) provides that:

... each State in which there is any non–attainment area (as defined in Subpart D of the Clean Air Act) shall adopt and submit *an implementation plan* which meets the requirements of section 110(a)(2)(I) and subpart D of the Clean Air Act *not later than January 1, 1979.*" (Emphasis added) (Uncodified).

There is no indication in either the language or the legislative history of the 1977 amendments that § 172 and Part D were intended to supersede the right of states to revise and update their particular emission standards under § 110(a)(3). In *Train*, the Supreme Court emphasized the importance of state discretion to set emission limitations, deeming it fundamental to the scheme of the Clean Air Act. The Court recognized that § 110(a)(3) is the "mechanism by which the states may obtain approval of their developing policy choices as to the most practicable and desirable methods of restricting total emissions to a level which is consistent with the national ambient air standards." 421 U.S. at 80, 95 S.Ct. at 1482. Bethlehem's construction of § 172 is at variance with this policy of state flexibility, because its interpretation would require a state to adhere to the complex and detailed substantive and procedural requirements of Part D whenever it desired to change a particular emission standard.

We conclude that EPA acted within its statutory authority when it measured DER's submission against the substantive standard appropriate to § 110(a)(3) revisions, rather than against the requirements of Part D and § 172.

### III. Qualification of Approval by EPA

The teaching of Train is that EPA must approve, without qualification, any SIP or revision that meets § 110 requirements. Bethlehem and U.S. Steel argue that EPA transgressed this rule when it made its ap-

---

**3.** A petition for review of this agency action is currently pending. This action does not affect the current case, however, because as demonstrated above, the coke oven emission regulations and the comprehensive Part D SIP revision are unrelated.

**4.** For a full discussion of the purpose of § 172, see D. Currie, *Relaxation of Implementation Plans Under the 1977 Clean Air Act Amendments*, 78 Mich.L.Rev. 155 (1979).

proval "subject to" certain "conditions, interpretations, and comments" dealing with the need to submit deferred compliance orders and minor significance determinations to EPA for their approval as plan revisions.

■ Under the notice and comment rulemaking process of the APA, agencies as well as the public have a right to comment and respond to comments on proposed agency action. The exercise of this right by an agency does not necessarily constitute the type of "qualified" approval prohibited by *Train.* In *Train* the Supreme Court was addressing a situation where the EPA might disagree with the mix of emission limitations chosen by the state and instead substitute different standards. 421 U.S. at 79, 95 S.Ct. at 1481. Here, the EPA approved Pennsylvania's coke oven emission standards exactly as submitted. In its comments, EPA was merely alerting the Commonwealth to an interpretation of federal law that would affect the state's future actions. The regulations with which the steel companies must comply as a matter of federal and state law were in no way altered by EPA's remarks. Consequently, we conclude that EPA's comments on the operation of the Clean Air Act did not amount to a qualification of its approval of the Pennsylvania SIP revision.[5] *Cf. Ohio Environmental Council v. U. S. EPA,* 593 F.2d 24 (6th Cir. 1979); *Northern Ohio Lung Ass'n v. EPA,* 572 F.2d 1143 (6th Cir. 1978) (upholding EPA approvals of SIP revisions where the agency has commented on or attached conditions to the state plan).

■ Petitioners also contend that the EPA based its approval on impermissible criteria when it discussed the practicability of the coke oven emission limitations. In *Union Electric Co. v. EPA,* 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1979), the Supreme Court held that the Clean Air Act forbids consideration of economic or technological feasibility when reviewing SIPs. U.

S. Steel urges that EPA violated this prohibition because in the document explaining its action it considered the necessity for and achievability of the DER regulations. At the same time, however, EPA stressed that it was not basing its approval on the forbidden considerations. Instead, it was merely responding to objections voiced by U.S. Steel during the public notice and comment process. U. S. Steel can hardly complain about the agency's efforts to be fair by thoughtfully addressing its comments.

## CONCLUSION

We conclude that the EPA acted in accordance with the Clean Air Act and that its approval of the SIP revision was not arbitrary, capricious, or an abuse of discretion. The petitions for review therefore will be dismissed.

---

5. Petitioners go on to challenge the correctness of EPA's interpretation of the Clean Air Act. This issue is not ripe for review at this time, however. All that this Court need now decide is whether EPA qualified its approval of Pennsylvania's regulations. The proper time to re-solve whether a deferred compliance order or minor significance determination must be submitted for EPA approval would come if EPA were to issue a final rule disapproving such an order.