**FLORIDA POWER & LIGHT COMPANY, Petitioner,**

v.

**Douglas M. COSTLE, as Administrator, Environmental Protection Agency and U. S. Environmental Protection Agency, Respondents.**

No. 80–5314.

United States Court of Appeals,
Fifth Circuit.
Unit B

June 29, 1981.

Hopping, Boyd, Green & Sams, William H. Green, Gary P. Sams, Tallahassee, Fla., for petitioner.

John C. Bottcher, Deputy Gen. Counsel, State of Fla. Dept. of Environmental Regulation, Tallahassee, Fla., for amicus curiae.

Lydia N. Wegman, Elizabeth Stein, Atty., Pollution Control Section, U. S. Dept. of Justice, Land and Natural Resources Division, Washington, D. C., for respondents.

Before TJOFLAT, HATCHETT and THOMAS A. CLARK, Circuit Judges.

TJOFLAT, Circuit Judge:

Florida Power & Light Company has petitioned for review, pursuant to section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1) (Supp.1979), of a rulemaking action by the Administrator of the Environmental Protection Agency (EPA) taken under section 110 of the Clean Air Act, 42 U.S.C. § 7410 (Supp.1979).

I

The Clean Air Act, 42 U.S.C. § 7401 *et seq.* (Supp.1979) (the Act), is an attempt to achieve and maintain national air quality standards for the protection of the public health and welfare. Under the Act, the

EPA is required to identify dangerous air pollutants, 42 U.S.C. § 7408 (Supp.1979), and to promulgate national ambient air quality standards specifying acceptable concentrations of these harmful pollutants, 42 U.S.C. § 7409 (Supp.1979). This petition involves two pollutants identified and regulated by the EPA: particulates and sulfur dioxide.

Congress chose a balanced scheme of state-federal interaction to implement the goals of the Act. Section 110(a)(1), 42 U.S.C. § 7410(a)(1) (Supp.1979), requires each state to adopt and submit to the Administrator of EPA a state implementation plan (SIP) specifying the methods the state will employ to attain the air quality standards promulgated by EPA. Each SIP must also identify the measures the state will impose to prevent significant deterioration of air quality in those that are in compliance with the national ambient air quality standards. 42 U.S.C. § 7471 (Supp. 1979). *See also Sierra Club v. Ruckelshaus,* 344 F.Supp. 253 (D.D.C.1972), *aff'd sub nom. Fri v. Sierra Club,* 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973).

The EPA is required to review each SIP to determine whether it meets the criteria for achievement and maintenance (prevention of deterioration) of national air quality standards. 42 U.S.C. § 7410(a)(2) (Supp. 1979). Under certain circumstances a state must submit a proposed revision of an SIP to the EPA. Relevant here is the requirement that a state submit a proposed SIP revision when a pollution source within the state intends to increase its emissions beyond the limits imposed by the EPA-approved SIP. EPA must use the same criteria it uses for evaluating an initial SIP to judge the adequacy of a revised SIP. 42 U.S.C. § 7410(a)(3) (Supp.1979). Absent a state implementation plan, or given a deficient state scheme, the EPA Administrator is authorized to promulgate an adequate SIP. 42 U.S.C. § 7410(c) (Supp.1979). If an SIP or a revised SIP meets the statutory criteria, however, the EPA *must* approve it. *Train v. National Resources Defense Council, Inc.,* 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). The state is "at liber-

ty" to devise the particular components of its pollution control plan so long as the plan is adequate to meet the standards mandated by EPA. *Id.* at 79–80, 95 S.Ct. at 1482. *See also Union Electric Co. v. Environmental Protection Agency,* 427 U.S. 246, 250, 96 S.Ct. 2518, 2522, 49 L.Ed.2d 474 (1976). The Act, therefore, establishes a program for air quality improvement that reflects the balance of state and federal rights and responsibilities characteristic of our federal system of government.

To implement the Act's goal of preventing significant deterioration of air quality in those geographic areas meeting national air quality standards, Congress categorized these areas into three classes, and established maximum increments of air pollution allowable in each class. *See* 42 U.S.C. §§ 7470–7479 (Supp.1979). Pursuant to this Congressional mandate, EPA promulgated regulations specifying that these increments were to be measured from a certain date, known as the baseline date, thus providing the perspective necessary to evaluate maintenance of air quality. These regulations established a national baseline date of August 7, 1977. *See* 43 Fed.Reg. 26400 (1978). The petition we must now review deals in part with the prevention of significant deterioration in one of the areas Congress afforded maximum protection, the mandatory Class I region of the Everglades National Park.

## II

Petitioner, an electric utility company incorporated and operating in the State of Florida, seeks review of EPA's action on a proposed SIP revision submitted by the State of Florida. To comply with Florida's EPA-approved SIP, petitioner burned low sulfur fuel oil at its oil-fired generating plants. Early in 1979, Exxon Company, U.S.A., petitioner's source of oil, informed the petitioner of a significant decrease in the availability of low sulfur fuel. Petitioner could not burn available higher sulfur fuel without exceeding the pollution limits imposed by Florida's SIP. In Febru-

ary of 1979, therefore, petitioner and other similarly situated Florida utilities petitioned Florida Governor Bob Graham for emergency relief under section 110(f) of the Act, 42 U.S.C. § 7410(f) (Supp.1979). Section 110(f) provides that, upon application by the owner or operator of a fuel-burning pollution source, the governor of a state in which the source is located may petition the President of the United States for a determination that a regional energy emergency exists and is of such severity that a temporary suspension of those parts of the SIP implicated by the energy emergency is necessary. Upon such a determination, the Governor is empowered to issue a temporary suspension of the relevant SIP provisions. This special relief is statutorily limited to a 120-day period for each effected pollution source. *Id.*

Governor Graham petitioned the President on behalf of Florida Power & Light and other Florida utilities. President Carter responded with a Presidential Determination that a regional energy emergency existed in Florida. 44 Fed.Reg. 21245 (1979). Soon thereafter, Governor Graham suspended portions of Florida's SIP.

Although this initial period of relief was extended through subsequent Presidential Determinations, *see, e. g.,* 44· Fed.Reg. 61157 (1979), the statutorily mandated 120-day relief period limited its effect on each source of pollution. Because Florida Power & Light perceived this limited relief to be inadequate in light of the anticipated duration of the low sulfur fuel shortage, it submitted to the Secretary of the Florida Department of Environmental Regulation a request for a state variance, and for an amendment to the Florida SIP providing for longer term exemption from the low sulfur fuel requirement. As discussed above, the Clean Air Act allocates primary responsibility for the terms of air quality attainment and maintenance to the states. Therefore, it was essential for petitioner to seek relief from Florida. If the state determined that the requested relief was appropriate, it would then seek EPA approval of its determination through submittal of a revised SIP. In accordance with this struc-

ture, Florida Power & Light appealed to Florida for a twenty-four month period of relief under section 403.20(1)(a)–(c) of the Florida statutes. Those subsections are part of Florida's statutory scheme of environmental protection; they read

403.201 Variances.

(1) Upon application the department in its discretion may grant a variance from the provisions of this act or the rules and regulations adopted pursuant hereto. Variances and renewals thereof may be granted for any one of the following reasons:

(a) There is no practicable means known or available for the adequate control of the pollution involved.

(b) Compliance with the particular requirement or requirements from which a variance is sought will necessitate the taking of measures which, because of their extent or cost, must be spread over a considerable period of time. A variance granted for this reason shall prescribe a timetable for the taking of the measures required.

(c) To relieve or prevent hardship of a kind other than those provided for in paragraphs (a) and (b) above. Variances and renewals thereof granted under authority of this paragraph shall each be limited to a period of twenty-four months.

Fla.Stat.Ann. § 403.201 (West).

After compliance with all procedural prerequisites, Florida's Department of Environmental Regulation responded to Florida Power & Light's request with an order dated August 28, 1979 (Order I). This order granted relief under section 403.201(1)(b) & (c) of the Florida statutes. It provided for relaxation of relevant SIP emission limitations and allowed for certain future increments of pollution, to be generated by petitioner's Turkey Point and Port Everglades plants, in the Class I region of the Everglades National Park. The order specified that the relief granted under section 403.-201(1)(c) would last for a period of two years, the maximum period allowed by that

section. While it is clear that Florida Power & Light initially applied for relief spanning only a twenty-four month period, Order I did not explicitly limit the relief granted under section 403.201(1)(b) to a period of two years. Rather, Order I stated that the Department of Environmental Regulation would retain jurisdiction over petitioner's application and, after further hearings, would determine several remaining issues, including that of "[t]he appropriate period of time for which this variance, and the relief granted thereby, shall be granted . . . ." Record, vol. 1 at 115.

Florida submitted Order I to EPA as a proposed SIP revision on August 31, 1979. Along with its substantive provisions, the proposal included proper documentation of compliance with required procedural safeguards regarding public notice and comment. Thereafter, on September 18, 1979, and October 2, 1979, the Florida Department of Environmental Regulation held hearings to address the issues it retained for further consideration. On October 18, 1979, the Department issued a supplemental order (Order II). Order II included a determination that: "[t]he term of the relief granted by this variance shall be two years, beginning with the date of this order; provided, however, that the Secretary of the Department may alter the relief provided herein . . . ." Record, vol. II at 431. Thus, as far as the state was concerned, it had granted Florida Power & Light relief for two years. At this time, however, Order II was not transmitted to EPA. While EPA was cognizant of Order II, EPA treated Order I as Florida's proposed SIP revision. As such, it was only Order I that was examined for compliance with section 110 of the Act. See 44 Fed.Reg. 69683 (1979).

On December 4, 1979, EPA published notice of its proposed action on Florida's SIP revision. EPA approved all but two parts of the proposed revision. First, Florida had failed to specify a testing method to measure compliance with the terms of the revised SIP. While most of the emission limitations were permissible under the Act, EPA could not approve them without a specified testing method. In providing for correction of this deficiency, EPA acknowledged its awareness of Order II: "No testing method for compliance is specified. The State, in a recent supplement [Order II] to the variance, has ordered FP&L to test for particulates using EPA test method 5 or 17. *This information, along with the testing method for sulfur dioxide, should be submitted to EPA as part of the SIP revision package.*" 44 Fed.Reg. 69684 (1979) (emphasis added). Second, EPA found Florida's relaxation of emission limitations on petitioner's Turkey Point and Port Everglades plants inappropriate because the proposed emissions would violate the sulfur dioxide increments established for the Class I region of Everglades National Park. *Id.* These preventions of significant deterioration increments were measured from the national baseline date of August 7, 1977. *See supra,* at 581.

In response to EPA's notice of proposed action, Stephen Smallwood, Chief of the Bureau of Air Quality Management, Florida Department of Environmental Regulation, sent EPA Order II under cover of a letter dated February 11, 1980 that, after stating where in Order II the required testing methods were described, requested "[p]lease *attach this October 18 Order [Order II] to and make it a part of* the August 31, 1979 SIP submission which presented the August 28, 1979 Variance Order [Order I] as a Plan revision." Record, vol. II at 420. (Emphasis added.) There is no indication in the record that Florida complied with the EPA's public hearing certification requirement with respect to Order II. *See* 40 C.F.R. § 51.4(d) (1980).

Florida Power & Light responded to EPA's proposed action by contending that the then recent decision of *Alabama Power et al. v. Costle,* 636 F.2d 323 (D.C.Cir.1980), justified further EPA consideration of the Turkey Point and Port Everglades emissions issue. *Alabama Power* held invalid certain EPA regulations relating to the prevention of significant deterioration of air quality. Among the invalidated regulations was the provision establishing a nationally uniform baseline date to measure incre-

ments of pollution in areas conforming to air quality standards. Petitioner argued that this judicial action, coupled with the court's guidance on what constituted a proper baseline, mandated reconsideration of Florida's proposed emission limitations, which had been rejected for failing to comply with allowable increments measured from the nationally uniform baseline date. Petitioner commented that, given the necessity for agency rectification of baseline criteria, Florida's emission proposals were potentially valid.

In its notice of final action, EPA rejected petitioner's argument because neither *Alabama Power* nor "present EPA regulations" provided for the type of baseline criteria suggested by petitioner. Accordingly, the Administrator disapproved Florida's Turkey Point and Port Everglades emission proposals. 45 Fed.Reg. 13456 (1980).

EPA's notice of final action did something in addition to approving Florida's SIP revision in part and disapproving it in part. Having made Order II part of Florida's SIP proposal, EPA incorporated Order II's two-year limit on relief into its final ruling: "[a]lthough not identified in the Federal Register proposal notice of December 4, 1979, this variance is a temporary SIP revision which will be in effect for two years from the date of the FP&L variance partition [sic], July 25, 1981." *Id.* at 13455.

Soon after publication of EPA's notice of final action, counsel for Florida Power & Light wrote to EPA requesting a technical amendment, based on the absence of any time limitation in Order I, eliminating the two-year limitation on relief. The record does not reveal an EPA response to this request. On April 29, 1980, Florida Power & Light filed a petition for review in this court challenging EPA's notice of final action. Petitioner asserts that EPA has acted inappropriately by incorporating Order II's two-year limitation on relief into its final rule, and in disapproving the relaxation of emission limitations on petitioner's Turkey Point and Port Everglades plants. The Florida Department of Environmental Regulation has filed an amicus curiae brief in

this case, joining petitioner's contention concerning the inappropriateness of EPA's incorporation of Order II's two-year limitation on relief.

### III

#### A

A threshold matter we wish to address is the question of whether Order II was properly before the EPA. Proposed SIP revisions may be submitted to the EPA only after the public hearing requirements of 40 C.F.R. § 51.4 (1980) have been met. *See* 40 C.F.R. § 51.6(f) (1980). Section 51.4(d) of the regulations provides that EPA be notified, through state certification accompanying the proposed SIP revisions, of state compliance with the hearing requirements. 40 C.F.R. § 51.4(d) (1980). Although Order II recited that it emerged from a process of deliberation that included public hearings, record, vol. II at 421, the state did not include a certification of public hearing when Order II was submitted to the EPA. *Compare* record, vol. II at 420 (Order II's submittal letter) *with* record, vol. I at 35–36 (Order I's submittal letter). We hold, however, that this minor procedural default should not preclude EPA consideration of the state submission.

It is clear that a presumption of regularity attaches to administrative action, *Chaney v. United States*, 406 F.2d 809, 813 (5th Cir.), *cert. denied*, 396 U.S. 867, 90 S.Ct. 128, 24 L.Ed.2d 120 (1969), and that the courts are to accord deference to an agency's interpretation of its own regulations. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Shell Oil Co. v. Federal Power Commission*, 491 F.2d 82, 88 (5th Cir. 1974). The issue, therefore, is whether deference is due to EPA's consideration of Order II despite the absence of a state public hearing certification.

The deference extended to agency implementation of regulations is bottomed on judicial respect for agency expertise. "The primary rational behind the doctrine of deference is recognition of administrative expertise developed through implementation

and enforcement of statutes and regulations." *Standard Oil Co. v. Department of Energy*, 596 F.2d 1029, 1055 (Em.App.) (1978). *See also Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980). We must review EPA's action with this fundamental consideration in mind.

In this case, EPA had received a properly certified SIP revision proposal (Order I). By finding the SIP approvable, with enumerated exceptions, EPA certainly took cognizance of state compliance with the public hearing requirements. Indeed, in reviewing that proposal, EPA had to determine that it had been adopted on the state level after compliance with all procedural prerequisites. *See Appalachian Power Co. v. Environmental Protection Agency*, 579 F.2d 846, 850 (4th Cir. 1978). EPA found it necessary, however, to request supplementation of this SIP revision proposal. This supplementation was to take the form of confirmation that the state was planning to employ certain EPA-approved testing methods in implementing its SIP. 44 Fed. Reg. 69684 (1979).

■ It is essential to review the procedural adequacy of EPA's acceptance of Order II in light of what was requested. As far as the EPA was concerned, Order I comprised all of Florida's SIP revision proposal—the supplementary testing method information was seemingly a purely formal, even peripheral matter. The testing methods in question are standard EPA methods used with regularity in monitoring compliance with SIP provisions. It is here that deference to agency expertise is particularly appropriate. The testing methods did not go to the substance of the SIP revision proposal, and EPA's great expertise in Clean Air Act enforcement apparently indicated that state adoption of already promulgated EPA testing methods did not require rigorous procedural safeguards. *See Donner Hanna Coke Corp. v. Costle*, 464 F.Supp. 1295, 1304 (W.D.N.Y.1979). These factors, in conjunction with the absence in the record of evidence of prejudice to any party derived from EPA's acceptance of

Order II, *National Labor Relations Board v. Selwyn Shoe Mfg. Corp.*, 428 F.2d 217, 224 (8th Cir. 1970), makes it appropriate for us to defer to EPA's decision to review Order II despite the minor procedural omission.

This result is supported by *Mision Industrial, Inc. v. Environmental Protection Agency*, 547 F.2d 123 (1st Cir. 1976). In that case, an SIP revision proposal, as originally subjected to public hearing, did not provide adequate assurances of state commitment of sufficient personnel and resources to implement the SIP, as required under the Clean Air Act regulations. *See* 40 C.F.R. § 51 at App. K (1980). "Assurances along these lines came later, under prodding of the Administrator." *Mision Industrial*, 547 F.2d at 130. Those later assurances were not presented for public comment on the state level. Nevertheless, the First Circuit held that EPA acted within its discretion in reviewing their adequacy: "Petitioners point out that the Commonwealth's proposed allocation of resources was not stated as part of the proposed revision itself at the time of the public hearing. Without endorsing the omission, we do not see it as fatal to the hearing or to the Administrator's later acceptance of the revision. Nothing in the record indicates that revision proponents used the omission to enhance their position." *Id.*, 547 F.2d at 130 n.5. We are convinced that the reasoning in *Mision* should control this case as well, and thus find that Order II was properly before the EPA.

B

Having concluded that the EPA acted properly in reviewing Order II, we must turn to the issue of whether it was appropriate for the EPA to incorporate Order II's state-imposed two-year limitation on relief into the SIP proposal submitted for EPA approval. The court and all parties to this dispute agree that EPA's incorporation of the state-imposed two-year limitation on relief must be upheld if EPA did not abuse its discretion by injecting it into the SIP revision proposal. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct.

814, 28 L.Ed.2d 136 (1971); *Texas v. Environmental Protection Agency*, 499 F.2d 289, 296 (5th Cir. 1974), *cert. denied*, 427 U.S. 905, 96 S.Ct. 3191, 49 L.Ed. 1199 (1976). To focus more clearly on the issue presented, we will restate the relevant facts.

When EPA first reviewed Florida's SIP revision proposal, it identified the inadequacies in the plan warranting correction. 44 Fed.Reg. 69683–84 (1979). After enumerating these problems, the agency stated: "EPA is today proposing to approve the Florida revision except for the portions affected by the deficiencies just described; it is proposed to disapprove the latter portions." *Id.* at 69684. This statement of proposed EPA action did not refer in any manner to the duration of relief granted to Florida Power & Light under Florida's proposal. In fact, Order I lacked a temporal limitation on relief granted under Florida section 403.201(1)(b). Nonetheless, absent a time provision, and with the exception of the enumerated deficiencies, EPA found Florida's SIP revision proposal in full compliance with all relevant Clean Air Act standards. In light of later EPA action, this finding of compliance with section 110(a)(2) of the Act cannot be emphasized too much.

As discussed above, *supra* at 583, EPA had identified two problems with Florida's submittal: the failure to identify testing methods, and the allegedly inappropriate relaxation of standards for future emissions at the Turkey Point and Port Everglades plants. By the time EPA issued its final ruling on the Florida proposal, the information in Order II had cured the test method deficiency. The Everglades emission problem still remained, however. Accordingly, EPA approved the Florida plan except for the proposed emissions limitations in the Everglades area. 45 Fed.Reg. 13455–13456 (1980). EPA's final rule also incorporated Order II's state-imposed two-year limitation on relief: "Although not identified in the Federal Register proposal notice of December 4, 1979, this variance is a temporary SIP revision which will be in effect for two years from the date of the FP&L variance partition [sic], July 25, 1981." *Id.* at 13455.

All parties agree that, whatever the legality of EPA's action, the designation of July 25, 1981, as the end-point of the variance is clearly incorrect. *See* Supplemental Brief of Respondent, EPA, at 3 n.2. At oral argument, counsel for EPA opined that the date could have been the result of a typographical error. Recently, EPA has acknowledged its error in the Federal Register. 45 Fed.Reg. 68405 (1980). The least this court must do, therefore, is vacate EPA's imposition of the July 25, 1981 deadline on the relief afforded FP&L, as imposition of a deadline without any support in the record is surely arbitrary and capricious. *See Texas*, 499 F.2d at 296. EPA insists, however, that the relief afforded FP&L still must be limited to two years; the agency asserts that the problem before the court will be solved if the deadline of October 18, 1981 (two years from the true date of the state variance), is substituted for that of July 25, 1981 in the EPA-approved Florida SIP revision proposal. 45 Fed.Reg. 68405 (1980). We must, therefore, address the merits of EPA's inclusion of the state-imposed two-year provision.

Our inquiry is controlled by *Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). That case identifies and delineates the respective roles of the states and EPA under the Clean Air Act. There is little room for doubt about the implications of *Train*; the message is clear that when the EPA reviews an SIP proposal,

> "[t]he [Clean Air] Act gives the Agency *no* authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of § 110(a)(2). . . . Thus, so long as the ultimate effect of a State's choice of emission limitations is compliance with the national standards for ambient air, the *State is at liberty* to adopt whatever mix of emission limitations it deems best suited to its particular situation.

*Id.*, at 79, 95 S.Ct. at 1482 (emphasis added).

EPA faces the same horizon when reviewing an SIP revision proposal:

[The Clean Air Act] *requires* the Agency to "approve any revision of an implementation plan" if it "determines that it meets the requirements" of § 110(a)(2). On its face, this provision applies to *any* revision, without regard either to its breadth of applicability, or to whether it is to be effective before or after the attainment date; rather, Agency approval is subject only to the condition that the revised plan satisfy the general requirements applicable to original implementation plans. Far from evincing congressional intent that the Agency assume control of a State's emission limitations mix once its initial plan is approved, the revision section is to all appearances the mechanism by which the States may obtain approval of their developing policy choices as to the most practicable and desirable methods of restricting total emissions to a level which is consistent with the national ambient air standards.

*Id.* at 80, 95 S.Ct. at 1482. *See also Union Electric Co. v. Environmental Protection Agency,* 427 U.S. 246, 250, 96 S.Ct. 2518, 2522, 49 L.Ed.2d 474 (1976); *Ohio Environmental Council v. Environmental Protection Agency,* 593 F.2d 24, 31 (6th Cir. 1979); *Appalachian Power Co. v. Environmental Protection Agency,* 579 F.2d 846, 851 n.7 (4th Cir. 1978); *Northern Ohio Lung Association v. Environmental Protection Agency,* 572 F.2d 1143, 1147 & 1149 (6th Cir. 1978).

■ Under the Act, therefore, states may provide for "ameliorative revisions" of an established pollution control scheme as long as national clean air standards are not compromised. *Train,* at 98, 95 S.Ct. at 1491. Furthermore, states may be stricter with polluters than the Clean Air Act requires. *Appalachian Power,* 579 F.2d at 851. The conclusion is inevitable that "[t]he [Clean

Air] Act recognizes that, as long as an SIP continues to satisfy the requirements of Section 110(a)(2) of the Act, 42 U.S.C. § 7410(a)(2), a state may revise *any* aspect of its plan, including the date of attainment." *Northern Ohio Lung Ass'n,* 572 F.2d at 1149.

■ The great flexibility accorded the states under the Clean Air Act is further illustrated by the sharply contrasting, narrow role to be played by EPA. Quite simply, "the Act provides that the Administrator '*shall* approve' the proposed plan if it has been adopted after public notice and hearing and if it meets [the] specified criteria. § 110(a)(2)." *Union Electric Co.,* 427 U.S. at 250, 96 S.Ct. at 2522 (emphasis added). "[I]n evaluating a proposed SIP, the Administrator is confined to the ... criteria set forth in Section 110(a)(2) of the Act, 42 U.S.C. § 7410(a)(2), and *may not* concern himself with factors other than those specifically enumerated therein." *Northern Ohio Lung Ass'n,* 572 F.2d at 1147 (emphasis added, footnote omitted).

■ The issue presented here, therefore, is whether, given the strictly circumscribed role of the EPA, the agency abused its discretion in attempting to *require* Florida to include the two-year limitation on relief contained in Order II in the EPA-approved SIP revision proposal.[1] We believe the agency did abuse its discretion in so acting, and accordingly we disapprove EPA's attempt to force Florida to convert its state limitation on relief into a federally enforceable SIP provision.

By its own ruling, the provision EPA insists upon incorporating into Florida's SIP revision does not affect Florida's substantive compliance with the Clean Air Act. *See* 44 Fed.Reg. 69684 (1979). *See also*

---

1. EPA asserts that Florida Power & Light has waived its right to contest the inclusion of the two-year limitation because the utility failed to raise an objection to its incorporation during the public comment period between publication of EPA's proposed ruling and EPA's final action. Brief of Respondent, EPA, at 23–24. This argument must fail because EPA failed, in its proposed ruling, to make any reference to

its desire to incorporate the temporal limitations of Order II into the proposed SIP revision. Florida Power & Light had no reason to comment on the matter until EPA's intention became clear; at that time, Florida Power & Light acted immediately to correct EPA. *See* Florida Power & Light's *Request for Technical Amendment,* record, vol. II at 536. Thus, the utility's argument is properly before this court.

*supra,* at 586. Thus, EPA is surely overstepping the bounds of its discretion; EPA can point to no provision of section 110(a)(2) of the Act that requires it to incorporate the Florida limitation and, as *Train* and *Union Electric* make clear, that is EPA's *only* proper inquiry.

EPA does not meet this contention, but rather argues that it was required to incorporate the two-year limitation into the SIP revision proposal because otherwise, under Florida law, the SIP would not be enforceable. Since the regulations prohibit the agency from approving SIPs that are not enforceable under state law, *see* 40 C.F.R. § 51.11 (1980), EPA had no choice, it asserts, other than to impose Florida's own state requirements through incorporating them into the federally-enforceable SIP. To support this position, EPA simply refers us to the word "timetable" in section 403.-201(1)(b) of the Florida Statutes, *see supra,* at 582, which, EPA asserts, requires firm temporal guidelines in regard to relief from state pollution control requirements. Absent such guidelines, it asserts, the statute is unenforceable under state law.

 This position is not well taken. As we read section 403.201(1)(b), its requirement that a timetable accompany a variance granted under that section does not mean that a final compliance deadline must be established for the state variance, and thus the SIP, to be enforceable under state law. The variance granted Florida Power & Light by Florida's Department of Environmental Regulation, the state agency charged with implementing the statute, recognized specifically that section 403.-201(1)(b) allowed for flexibility; Order II recited that relief under section 403.-201(1)(b) was granted for two years, "provided, however, that the Secretary of the Department may alter the relief provided herein . . . ." Record, vol. II at 431. The language of the statute itself gives no indication that variances granted under it become a nullity absent a final compliance deadline, and EPA has pointed the court to nothing in Florida law that supports EPA's strained interpretation of the statute.

Moreover, it must be emphasized that EPA is to be accorded no discretion in interpreting state law. Quite the contrary is true: "[the United States] should defer to the state's interpretation of the terms of its air pollution control plan when said interpretation is consistent with the Clean Air Act." *United States v. Interlake, Inc.,* 432 F.Supp. 985, 987 (N.D.Ill.1977). *See also Ohio Environmental Council,* 593 F.2d at 29 (EPA reliance on state interpretation of state law is consistent with the agency's secondary role under the Clean Air Act).

Furthermore, EPA's contention has no support in the record before us. Florida has steadfastly maintained that EPA has misinterpreted the requirements of Florida law. *See Brief of Amicus Curiae, State of Florida Dept. of Environmental Regulation.* When EPA ruled that it would incorporate the two-year limitation into the SIP revision proposal, the State of Florida objected. The State argued that EPA was incorrect in its interpretation of Florida law, and stressed that the state never intended to include the two-year provision in the federally enforceable scheme. Accordingly, to cure the dilemma, Florida requested EPA to consider the limitation, which the State never conceded it had actually submitted, withdrawn. Letter from Florida Dept. of Environmental Regulation to Regional Administrator of EPA, *Supplemental Brief of Petitioner,* Addendum A. *See also Brief of Respondent, EPA,* at 21 n.13; *Brief of Amicus Curiae, State of Florida Dept. of Environmental Regulation* at 8. Rather than reassessing its position, EPA chose not to defer to Florida's interpretation of its own state law. Indeed, it decided to treat the State's response "as a new SIP revision," 45 Fed.Reg. 68405 (1980), and then went on to disapprove it because, among other things, Florida, in writing to correct the EPA, had failed to meet the Clean Air Act's public hearing requirements. *Id.*

EPA insists, therefore, on incorporating into Florida's SIP a state pollution variance provision that is irrelevant to state compliance with the Clean Air Act. It does so, moreover, on the basis of a strained inter-

pretation of state law that the State itself has taken great pains to demonstrate as wholly incorrect. EPA has thus entangled itself in a matter beyond its proper concern, see *Train* and *Union Electric*, and has done so in the face of well-founded state objections. *See Texas v. Environmental Protection Agency*, 499 F.2d at 310. This is clearly an abuse of discretion; it is agency action beyond the Congressional mandate. It serves, furthermore, to usurp state initiative in the environmental realm, and thus to disrupt the balance of state and federal responsibilities that undergird the efficacy of the Clean Air Act. We must, therefore, disallow the EPA's attempted incorporation of Florida's two-year variance limitation into the federally enforceable SIP revision.

## C

The final issue to be resolved concerns EPA's disapproval of Florida's proposed relaxation of emission limitations at petitioner's Turkey Point and Port Everglades generating plants. It is uncontested that EPA used the 1978 prevention-of-significant-deterioration regulations and the national baseline date of August 7, 1977 to evaluate the emissions limitations Florida proposed for the Turkey Point and Port Everglades plants. It is also uncontested that Florida's proposal, if implemented, would yield emissions in excess of levels permissible under the 1978 regulations. What would otherwise be a straight-forward ruling, however, has been complicated by the case of *Alabama Power Co. v. Costle*, 606 F.2d 1068 (D.C.Cir.1979) (*per curiam*), *superseded*, 636 F.2d 323 (D.C.Cir.1980).

In *Alabama Power*, the United States Court of Appeals for the District of Columbia Circuit invalidated the baseline provisions of the 1978 prevention-of-significant-deterioration regulations. For various reasons, however, the court, on unopposed motion of the parties, stayed the mandate, and thus postponed the effective date of the judgment. *See* Fed.R.App.P. 41(a). The Court stayed the mandate in *Alabama Power* from January, 1980, until July, 1980. It was during this interim period, on February

29, 1980, that EPA acted on the basis of the 1978 regulations to disallow Florida's Turkey Point and Port Everglades plant emission limitation proposals.

Florida Power & Light, a party to the *Alabama Power* litigation, submitted comments on EPA's proposed ruling on the Turkey Point and Port Everglades issue, arguing that the result in *Alabama Power* should cause EPA to wait before issuing a final ruling based on the invalidated regulations. At the same time, Florida Power & Light suggested a new test the utility believed appropriate under *Alabama Power* for measuring air quality deterioration. EPA rejected this commentary, basing its decision on the absence of "present EPA regulations or guidance" that would provide support for such EPA action. 45 Fed.Reg. 13456 (1980).

This disagreement, coupled with adverse contentions about whether the *Unopposed Joint Petition for Further Stay of the Issuance of Mandate* in *Alabama Power, see Supplemental Brief of Petitioner*, Addendum F, to which both Petitioner and EPA were parties, should be interpreted to preclude EPA action founded upon the discredited baseline criteria, initially triggered this litigation. We need not rule here, however, on the basis of the efficacy of the *Alabama Power* judgment vis-a-vis these parties.

The court will take notice, *U. S. Steel Corp. v. Environmental Protection Agency*, 595 F.2d 207, 212 n.11 (5th Cir.), *modified in part*, 598 F.2d 915 (5th Cir. 1979), of EPA's publication in the Federal Register, 45 Fed.Reg. 52676 *et seq.* (1980), of regulations replacing those invalidated in *Alabama Power*. These regulations are presently the law. Assuming for the sake of argument that EPA's position on the validity of the 1978 regulations at the time of its final ruling on the Turkey Point and Port Everglades matter is correct, EPA nonetheless is requesting this court to uphold administrative action founded upon presently invalid regulations. We can perceive no utility and even less virtue in doing this.

In *United States v. Schooner Peggy*, 1 Cranch 103, 110, 2 L.Ed. 49, 51 (1801), Chief Justice Marshall wrote:

> [I]f subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied. If the law be constitutional, . . . I know of no court which can contest its obligation. It is true that in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of parties, but in great national concerns . . . the court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law, the judgment must be set aside."

The Supreme Court reaffirmed the authority of this declaration in *Thorpe v. Housing Authority of Durham*, 393 U.S. 268, 282, 89 S.Ct. 518, 526, 21 L.Ed.2d 474 (1969), stressing that the rule "[s]urely . . . applies with equal force where the change is made by an administrative agency acting pursuant to legislative authorization." *Id.*

▮ "In hearing a petition for review, a court of appeals may exercise equitable powers in its choice of a remedy, as long as the court remains within the bounds of statute and does not intrude into the administrative province." *Sharon Steel Corp. v. Environmental Protection Agency*, 597 F.2d 377, 381 (3d Cir. 1979). In equity, we cannot ignore the application of this rule to the case before us. The proper course is to remand the Turkey Point and Port Everglades emissions relaxation issue to EPA for reconsideration in light of the presently controlling prevention of significant deterioration regulations. *See Concerned Citizens of Vicksburg v. Sills*, 567 F.2d 646, 649–50 (5th Cir. 1978). We accordingly do so.

VACATED IN PART AND REMANDED IN PART.