EMBRY, Justice.
We granted the writ of certiorari in order to review the Court of Civil Appeals’ decision, 480 So.2d 558, upholding the Montgomery County Circuit Court’s judgment which denies relief to plaintiffs in an action *564 to recover funds allegedly owed under the Medicaid program. We reverse.
We choose to address three dispositive principles of law set out by the Court of Civil Appeals, which have been framed as issues by the petitioners. That court found: (1) In order for AlaMed’s reimbursement methodology to be declared valid, Alabama Medical Agency (AlaMed) need only show the Secretary of Health and Human Services (HHS) approved and verified its plan; (2) All three plaintiffs received sufficient reimbursement to comply with federal law and regulations; (3) Under the pleadings and facts presented, plaintiffs were estopped to deny the terms of their agreement, or to assert that their agreement was other than its terms provided.
The facts necessary for our consideration of the above principles are accurately set out by the Court of Civil Appeals. Additionally, we find the record supports petitioners’ ARAP 39(k) statement, which provides in pertinent part:
“ ‘3. The budget variance aspect of AlaMed’s reimbursement methodology is provided for in Chapter 18 of the AlaMed Reimbursement Manual, which was part of AlaMed’s State Plan for the years 1978, 1979, 1980 and 1981. The following is an accurate description of how the “budget variance” was applied: During the years 1978, 1979, 1980 and 1981, AlaMed projected the reimbursement rate for nursing homes by using the cost reports each home filed with the Agency each September. Using the actual costs reported by the nursing home during the prior year, AlaMed would add to it an inflation factor and make a few other adjustments and come up with a projected rate for reimbursement during the following year. The following year the provider would be paid the projected rate. However, when it then filed its cost report the following June, it would often be the case that the actual costs of the nursing home were either greater or lesser than the projected payment rate had been, which was the rate actually paid. This difference between the nursing home’s actual costs and its payment rate for the year was a “budget variance.” In those cases in which the nursing home’s actual costs were greater than its payment rate for that year, the nursing home was underpaid in that year, i.e., there was a “positive variance.” Chapter 18 of the Nursing Home Reimbursement Manual, which was in effect during the years 1978, 1979, 1980 and 1981, provided that such a positive variance would be added to the projected actual costs of the nursing home for the following year, allowing the nursing home to recover those unpaid costs in the following year. If the nursing home’s costs were less than the payment rate, then AlaMed would have overpaid the nursing home in that year, i.e., there was a “negative variance.” In such cases, the negative variance would be subtracted from the nursing home’s projected allowable costs for the following year, reducing its payment rate and thus allowing AlaMed to recoup such amounts which were overpaid in the prior year.
“ ‘The application of the maximum ceiling set by the 60th percentile methodology to the budget variance operated to limit the ability of a nursing home in a subsequent year to recover those amounts which it was underpaid in the prior year. If, when the positive variance was added to the projected payment rate of the nursing home in the following year, and the total thereof exceeded the maximum ceiling set by the 60th percentile, the nursing home could recover only the maximum ceiling rate, because AlaMed pays the lesser of the maximum ceiling or the actual costs.’ ”
I
The Court of Civil Appeals erroneously determined that “in order for AlaMed’s reimbursement methodology to be declared valid, AlaMed need only show the Secretary of Health and Human services approved and verified the plan.” This error was compounded when the lower court summarily concluded that since the plan *565 had in fact been verified by the secretary, it necessarily was in compliance with the Social Security Act and the regulations thereunder.
While it is true that 42 U.S.C. § 1396a(a)(13)(E) (1974), requires the reimbursement plan developed by the State be approved and verified by the Secretary, this section by no means insulates or immunizes the plan from judicial scrutiny, as the reasoning of the Court of Civil Appeals supposes. The actions of agencies entrusted with the implementation of Acts of Congress are presumptively valid, Mazaleski v. Treusdell, 562 F.2d 701, 717 n. 38 (D.C.Cir.1977), and are to be given great deference, United States v. Larionoff, 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); Florida Light and Power Company v. Costle, 650 F.2d 579 (5th Cir.1981). The burden of overcoming this presumption however, is not insurmountable. Skinner v. United States, 594 F.2d 824, 830, 219 Ct.Cl. 322 (1979).
In Alabama Nursing Home Association v. Harris, 617 F.2d 388 (5th Cir.1980), the court specifically noted:
“We pretermit deciding and intimate no opinion whether the [Alabama] plan’s payment rates comply with the requirement of § 1396a(a)(13)(E). Our disposition of this issue is without prejudice to the appellants’ right to challenge the payment rates on remand should HEW, in the proper exercise of its agency duties, determine that the Alabama plan meets federal standards.” (Emphasis added.)
617 F.2d at 395.
In King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), the United States Supreme Court invalidated an Alabama welfare regulation on the grounds that it was inconsistent with another portion of the federal Social Security Act. In rendering this decision, the court declared as follows:
“There is of course no question that the Federal Government, unless barred by some controlling constitutional prohibition, may impose the terms and conditions upon which its money allotments to the States shall be disbursed, and that any state law or regulation inconsistent with such federal terms and conditions is to that extent invalid.... It is equally clear that to the extent HEW has approved any [state law or regulation] which conflicts with § 406(a) of the Social Security Act, 42 U.S.C. § 606(a), such approval is inconsistent with the controlling federal statute.” (Citations omitted.)
392 U.S. at 333, n. 34, 88 S.Ct. at 2141 n. 34.
Lastly, in Alabama Hospital Ass’n v. Beasley, 702 F.2d 955 (11th Cir.1983), a portion of Alabama’s reimbursement methodology for hospitals was declared invalid for failure to comply with federal law, even though the Department of Health and Human Services had previously approved the plan.
These cases leave no doubt that the Secretary’s approval is in nowise a conclusive determination of the plan’s validity, but rather, is subject to judicial review. Accordingly, the Court of Civil Appeals erred in finding that the reimbursement plan was in compliance with federal law simply because the Secretary of the Department of Health and Human Services had verified the plan.
Similarly, the Court of Civil Appeals erroneously considered the holding of Alabama Nursing Homes Association v. Schweikar, No. 77-52-N (N.D.Ala., Feb. 19, 1982), to be dispositive of the plan’s validity. The parties in the instant case stipulated that “The United States District Court for the Middle District of Alabama rejected the challenge to this reimbursement methodology in Alabama Nursing Homes Association v. Schweiker.” In that case Judge Varner held that the plaintiffs’ claims for retrospective relief were barred by the Eleventh Amendment and furthermore were moot in light of the recent Amendment to the Social Security Act. See Pub. Law 96-499 § 962; 94 Stat 2650 (1980). Any suggestion that the federal *566 district court considered the merits of AlaMed’s claim at issue here must rest purely in dicta. Moreover, Judge Varner’s comments clearly dispel such a notion. He states: “Here, the law which might otherwise make the State defendants’ conduct unlawful has changed.”[1]
Thus, having concluded the basis for the Court of Civil Appeals’ conclusions were erroneous, we now turn to the merits of AlaMed’s claim.
II
The applicable federal law governing medicaid reimbursement methodologies provides in pertinent part:
“(a) A state plan for medical assistance must_

“(13) provide

“(E) Effective July 1, 1976, for payment of the skilled nursing facility and intermediate care facility services provided under the plan on a reasonable cost related basis, as determined in accordance with methods and standards which shall be developed by the State on the basis of cost finding methods approved and verified by the Secretary [of Health, Education, and Welfare, now Health and Human Services].” Emphasis added.)
42 U.S.C. §§ 1396a(a)(13)(E) (1974).
The phrase “reasonable cost related basis” has consistently been interpreted by courts and the Department of Health and Human Services to prescribe upper and lower limits on the acceptable range of reimbursement rates between which provided payments must fall. See Alabama Nursing Home Association v. Harris, 617 F.2d 388, 392 (5th Cir.1980); see also 41 Fed.Reg. at 27,301.
In American Health Care Association, Inc. v. Califano, 443 F.Supp. 612, 616 (D.D.C.1977), a case involving many of the regulations present here, the Secretary of HEW (now HHS) was ordered to promulgate and issue “a statement of basis and purpose” in order to advise interested persons and entities of the intended operation of the regulation. In response to this order, the Secretary issued the following statement, which was intended to clarify the original preamble to the federal regulations involved here, 43 Fed.Reg. 4,861.
“ ‘[Reasonable cost related’ payment rates must be be [sic] no lower than the amount adequate to cover in full the costs of providing the minimum care required under applicable federal and state law and standards of participation. Thus the cost to an efficiently and economically operated facility of meeting these Federal and State standards represents a ‘floor’ on reasonable cost related payment rates.”
43 Fed.Reg. at 4,862.
After taking note that the federal scheme contemplated both a minimum and a maximum reimbursement rate, the Secretary added further that an approvable plan “must provide for a method of determining payment rates which assures that all participating providers’ payment rates will fall somewhere between the maximum and minimum reasonable cost related rates.” 43 Fed.Reg. at 4,863.
Petitioners concede that the AlaMed provider plan and methodology, including its budget variance aspects, were approved by the Secretary. That plan prescribed payments of the lesser of the providers’ projected actual costs or the 60th percentile ceiling.
Nevertheless, petitioners argue the plan, as applied to them, is violative of federal law in that providers were denied payments *567 amounting to either their actual costs or the 60th percentile ceiling due to the budget variance policy. Accordingly, the providers argue, since payments received fell below the approved “floor,” reimbursements have not been made on a reasonable cost related basis as required by 42 U.S.C. § 1396a(a)(13)(E). In a collateral argument, the providers contend the payment plan is likewise in violation of 42 C.F.R. § 447.302(b), which has the force and effect of law. That regulation reads in pertinent part:
“(b) Payment rates [to providers] must not be set lower than rates that the agency reasonably finds to be adequate to reimburse in full the actual allowable costs of a facility that is an economically and efficiently operated facility.”
In the instant case, the plan in question does provide for a minimum and a maximum rate for provider reimbursement which is cost related and is therefore consistent with federal law. Specifically, the plan provides that if a provider’s actual costs were less than the 60th percentile ceiling rate in a given year, the provider would be entitled to its actual costs. In no event would the hospitals be reimbursed for expenses exceeding the 60th percentile ceiling, thereby creating a federally approved “cap” on reimbursement.
The budget variance aspects of the State’s plan are set out in Chapter 18 of the AlaMed Reimbursement Manual, which was likewise verified by the Secretary. It clearly provides that each provider will be “reimbursed” for the succeeding year on a historical cost plus budgeted additional expenditures basis. In other words, whatever a hospital was underpaid in one year, the positive variance, would be included in the succeeding year’s budget. Once again, such a budget variance policy has been recognized by the department as being ap-provable and consistent with federal law. Congress approved the establishment of reasonable cost related rates on either a prospective or a retrospective basis. See Alabama Nursing Homes v. Harris, 617 F.2d at 392 (citing 43 Fed.Reg. at 4,861-62 (1978)). See also 41 Fed.Reg. 27,302-03.
As the undisputed evidence shows, however, the practical effect of the budget variance policy, applied in conjunction with the 60th percentile ceiling, operated to deny hospitals the ability to recoup their “positive variance” incurred the preceding year. Stated in simple terms, it was often the case that when the preceding year’s positive variance was added to the current year’s projected expenses, the sum total would exceed the maximum amount allowable per year, due to the 60th percentile ceiling. In effect, only when the combination of the current year’s expenses and the preceding year’s positive variance fall below the ceiling on yearly expenses would a hospital ever recoup the amount it was underpaid the preceeding year. The record clearly shows that this was seldom, if ever, the case. Consequently, it was often the case that a hospital would be paid less than the federally approved floor on reimbursements, and be denied the difference in the succeeding year. Such a payment scheme denies the hospital its actual costs on a costs-related basis and is therefore in violation of 42 U.S.C. § 1396a(a)(13)(E), as well as 42 C.F.R. § 447.302(b).
The “catch 22” scenario created by the budget variance policy, as applied in conjunction with the 60th percentile ceiling, may be graphically depicted by reviewing the expenses of one of the petitioners, Valley Brook Park, Inc., for the years 1978, 1979, 1980, and 1981:
BUDGET VARIANCE 1978 1979 1980 1981
Net adjusted expense $587,828 $628,126 $675,146 $665,562
Add: Projected costs July-December 22,235 • 30,844 28,661 24,958
plus/minus prior year’s variance 00 (7,352) 3,546 23,656
Total Cost $610,063 $651,618 $707,353 $714,176
Actual Patient Days 28,277 27,280 25,714 25,030
*568 BUDGET VARIANCE 1978 1979 1980 1981
Average rate per day 21.57 23.88 $ 27.50 $ 28.53
Ceiling rate 22.87 24.89 26.78 28.40
Reimbursement rate 21.83 23.75 25.86 28.40
Budget variance per patient day (.26) .13 .92 .00
Total budget variance ($ 7,352) 3,546 $ 23,656 .00
In 1978 for instance, Valley Brook’s average rate per patient day was $21.57 while its. reimbursement rate, as projected by AlaMed, was $21.83. This resulted in an overpayment, or negative variance, of twenty-six cents per patient day. The total negative variance of $7,352 was recouped by AlaMed the following year by deducting that amount from the projected budget for the year 1979. In contrast, Valley Brook suffered a positive variance in 1980 totaling $23,656, or ninety-two cents per patient day. Valley Brook was unable to recoup this variance, however, because its reimbursement rate in 1981 was limited to the 60th percentile method ceiling of $28.40, while its costs, including the preceeding year’s positive variance, was $28.53. Thus, in 1980, Valley Brook was underpaid the amount approved by federal authorities as being “adequate to reimburse in full the actual allowable costs of a facility that is economically and efficiently operated.” 42 C.F.R. 447.302(b).
Based upon the foregoing, we hold the reimbursement plan in question, as applied to the petitioners, was in violation of 42 U.S.C. § 1396a(a)(13)(E) and 42 C.F.R. § 447.302(b). Accordingly, the Court of Civil Appeals erred in upholding the plan as being in compliance with federal law.
AlaMed argues the budget variance policy was never intended to guarantee complete reimbursement, but rather served as a built in incentive for providers to hold down costs. This position is refuted by the terms of Chapter 18, which provide for “reimbursement” where a hospital is “underpaid.” Second, such a position is tantamount a declaration that compliance with federal law was never guaranteed. While Congress has recognized an interest in holding down provider costs, so too has it recognized the paramount interest in securing adequate health care for our citizens. See Alabama Nursing Homes, 617 F.2d at 392 n. 6. It is an untenable position indeed to suggest that Congress intended for the former interest to emasculate the latter.
We now turn to the Court of Civil Appeals’ conclusion that the providers are contractually estopped to deny the terms of the provider agreement.
Ill
The Court of Civil Appeals held that “the plaintiffs were estopped to deny the terms of their agreement or to assert that their agreement was other than its terms provided.” We cannot agree.
As an affirmative defense, estop-pel must be pleaded. ARCP 8(c). The facts constituting the defense of estoppel must be set forth with particularity. Kimbrell v. City of Bessemer, 380 So.2d 838 (Ala.1980). The record shows that AlaMed failed to raise estoppel in the responsive pleadings, and, therefore, the defense is waived. Robinson v. Morse, 352 So.2d 1355 (Ala.1977).
AlaMed contends, and the Court of Civil Appeals agreed, that the issue was tried by implied consent and therefore that the pleadings were automatically amended under ARCP 15(b) in that the provider contracts were introduced to the court without objection. We note the agreements were admitted as a “Supplement to the Record for Motion to Dismiss” in support of an immunity defense, a defense which was properly set out in the pleadings.
Admittedly, the agreements are evidence tending to support the defense of estoppel. *569 Nevertheless, it does not follow that every collateral issue touched upon by the incidental inferences of the agreements can be considered to have been tried with the implied consent of the petitioners. Cf. Ellis v. Arkansas-Louisiana Gas Co., 609 F.2d 436, 440 (10th Cir.1979); Browning Debenture Holders’ Committee v. DASA Corporation, 560 F.2d 1078, 1086 (2d Cir.1977). To hold otherwise would allow the renaissance of “trial by ambush,” something the modern rules of civil procedure were designed to prevent.
Further, the petitioners argue that to allow the automatic amendment of the es-toppel defense at this time would work substantial prejudice against them. We agree. In this vein, the providers insist that had they been apprised of the estoppel issue, they would have submitted evidence pertaining to some or all of the following issues:
(1) The element of economic duress and coercion regarding whether the parties executed the contracts from bargaining positions of equal strength.
(2) Whether the contracts were void or voidable because of mutual mistake and/or unilateral mistake which the other party recognized.
(3) Fraud in that the agency omitted to apprise the plaintiffs of a material fact.
(4) Whether and to what extent the agency reasonably relied on the contracts so as to entitle the defendant to assert the estoppel theory.
(5) Whether the defense of estoppel is unavailable because it would result in unjust enrichment to the defendant.
In any event, an estoppel defense may not accrue to circumvent the rights guaranteed the providers under the Social Security Act and regulations promulgated thereunder. Cf. Rodriguez v. Vowell, 472 F.2d 622 (5th Cir.1973); Board of Directors v. National Credit Union Administration, 477 F.2d 777 (10th Cir.1973); Alabama Nursing Home Association v. Califano, 433 F.Supp. 1325, 1330 (N.D.Ala.1977). See also Children’s Memorial Hospital v. Illinois Department of Public Aid, 562 F.Supp. 165 (N.D.Ill.1983).
Accordingly, the judgment of the Court of Civil Appeals is reversed and the cause .is remanded to that court for action consistent with this opinion.
REVERSED AND REMANDED.
FAULKNER, JONES, ALMON, SHORES, BEATTY and ADAMS, JJ., concur.
MADDOX, J., dissents.
TORBERT, C.J., not sitting.

. For the purposes of this case, this statutory change is inconsequential for the following reasons: (a) Of the four separate claims for monetary relief raised by the three individual plaintiffs, three of the claims arose prior to the amendment to the federal statute, (b) Additionally, the federal regulations upon which the Plaintiffs’ claims are based remained unchanged until September 30, 1981, notwithstanding the change in the statutory language. See 46 Fed. Reg. 4,971-73.